# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| PRAIRIE RIVER HOME CARE, INC., | Civil No. 17-5121 (JRT/HB) |
| Plaintiff, | |
| v. | |
| PROCURA, LLC, a/k/a COMPLIA HEALTH, | **MEMORANDUM OPINION & ORDER** |
| Defendant. | |

_____

PROCURA, LLC, a/k/a COMPLIA
HEALTH,

           Defendant/Third-Party Plaintiff,

v.

SALO SOLUTIONS, INC.

           Third-Party Defendant.

---

Jade B. Jorgenson and Pamela Abbate-Dattilo, **FREDRIKSON & BYRON, PA,** 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402, for plaintiff.

Klay C. Ahrens, **HELLMUTH & JOHNSON PLLC,** 8050 West Seventy-Eighth Street, Edina, MN 55439, and Hillard M. Sterling, **TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP,** 303 West Madison Street, Suite 1200, Chicago, IL 60606, for defendant and third-party plaintiff.

Jeffrey M. Thompson, **MEAGHER & GEER, PLLP,** 33 South Sixth Street, Suite 4400, Minneapolis, MN 55402, for third-party defendant.

This dispute involves three contracts entered into by Plaintiff Prairie River Home Care ("Prairie River"), a home healthcare provider based in Minnesota; Defendant and Third-Party Plaintiff Procura, LLC ("Procura"), a Michigan software company; and Third-Party Defendant Salo Solutions, Inc. ("Salo"), a consulting a training company. Prairie River contracted to buy a license to Procura's software, which never functioned properly on Prairie River's systems. Separately, Salo contracted with Prairie River to provide consulting and training services in connection with the implementation of Procura's software. Salo and Procura also had a contract stating terms for mutual client referrals.

In its Second Amended Complaint, Prairie River brought five claims against Procura: (I) Breach of Contract; (II) Breach of Express Warranty; (III) Breach of the Implied Warranty of Merchantability; (IV) Fraudulent Inducement; and (V) Violations of the Illinois Consumer Fraud Act. Prairie River seeks monetary damages, including consequential damages. Procura then filed a Third-Party Complaint against Salo, alleging two Counts of Breach of Contract and seeking indemnification for Prairie River's claims against it.

Two motions are now before the Court: (1) Procura's partial motion to dismiss Prairie River's claims for consequential damages and Counts III and V of the Second Amended Complaint; and (2) Salo's motion to dismiss the Third-Party Complaint. Because Prairie River has alleged facts sufficient to show that the contractual clauses limiting remedies and disclaiming consequential damages are invalid, the Court will deny Procura's motion to dismiss Prairie River's claims for consequential damages. Because the contract between Prairie River and Procura contains a valid warranty disclaimer, the

Court will grant Procura's motion to dismiss Count III. Because Procura's alleged fraud did not occur primarily and substantially in Illinois, the Court will grant Procura's motion to dismiss Count V. Finally, because Procura has failed to state a claim against Salo, the Court will grant Salo's motion to dismiss in full.

## BACKGROUND

### I. The Prairie River/Procura Agreement

Prairie River is a family-owned, Minnesota-based company that provides in-home care and medical services for the elderly and people with disabilities. (2d Am. Compl. ("SAC") ¶¶ 5-7, Aug. 31, 2018, Docket No. 65.) Its corporate office is in Buffalo, Minnesota, and it has eight branch offices throughout the state. (*Id.* ¶ 7.) As a licensed, Medicare-certified home health agency, Prairie River is highly regulated and has specific billing and documentation needs. (*Id.* ¶¶ 5, 15.) It relies on commercial software designed for the care industry to meet those needs and to assist with other aspects of business management and operations. (*See id.* ¶¶ 11-13, 15-16.)

Prairie River was referred to Procura by Salo. (3d Party Compl. ("TPC") ¶ 18, Sept. 17, 2018, Docket No. 69.) Prairie River contacted Procura in May of 2015 after seeing Procura advertise itself as offering "a complete (and highly configurable) software package" for care companies. (SAC ¶¶ 11-12.) At that time, Prairie River was using a software system called Riversoft. (*Id.* ¶ 12.) Although Riversoft was meeting Prairie River's needs, Prairie River was looking for enhanced documentation capabilities. (*Id.* ¶ 13.) To ensure that Procura was capable of meeting its needs, Prairie River described to

Procura its billing and documentation needs, the large size of its database, and its need for a new software system to be "live" by February 2016. (*Id.* ¶¶ 15, 18, 20.) Procura assured Prairie River that its software ("the Software") would meet Prairie River's needs, could be implemented by February 2016, and would be easy to customize. (*Id.* ¶¶ 15-18, 21.) Procura also told Prairie River that "tons" of former Riversoft customers had transitioned smoothly to the Software. (*Id.* ¶ 22.)

Between June and October, 2015, Procura conducted several software demonstrations for Prairie River. (*Id.* ¶ 14.) Prairie River was unable to test the Software outside of those demonstrations. (*Id.*) On September 18, Procura representatives came to Prairie River's corporate office in Buffalo, Minnesota, to negotiate a sale. (*Id.* ¶ 25.) During that visit, Procura told Prairie River that it wanted to reach an agreement by September 30 so that it could include the sale in its third quarter reports. (*Id.*) Prairie River requested more time to consider the terms, but on September 29, Procura's President and CEO, Chris Junker, came to Minnesota to finalize the sale. (*Id.* ¶¶ 25-26.) Prairie River alleges that Junker pressured Prairie River representatives to commit to a sale by the next day. (*Id.* ¶ 26.) The parties ultimately entered into an agreement (the "Agreement") on September 30. (*Id.* ¶ 27.)

The Agreement gave Prairie River access to the Software and related support services in exchange for $521,819.00. (*Id.* ¶¶ 29-31.) Procura agreed to provide both hardware and software support services, including in the case of a "Software Problem." (*Id.* ¶ 31.) The Agreement defines "Software Problem" as "an inability of the Software to perform, in all material respects, in accordance with its related Documentation." (*Id.* ¶ 32.)

"Documentation" refers to Procura's "user guides, operating manuals, educational materials, product descriptions and specifications, technical manuals, supporting materials, and other information relating to the Software." (Answer to SAC at 41, Ex. A ("Agreement") § 1, Sept. 21, 2018, Docket No. 72-1.)

The Agreement includes a "Warranty of Performance," warranting that the Software would "be capable of functioning substantially in accordance with its related [D]ocumentation" and "in a manner consistent with industry standards." (*Id.* § 7.2(ii).) It also required the Software to be substantially functional within 90 days of the Agreement's execution. (*Id.* § 7.2(iii).) Finally, it explicitly limits remedies to a refund and disclaims consequential damages and all implied warranties:

> **8.1 Basic Disclaimer.** EXCEPT AS EXPRESSLY PROVIDED IN SECTION 7, THE SOFTWARE . . . AND ALL MAINTENANCE SUPPORT AND PROFESSIONAL SERVICES ARE PROVIDED ON AN "AS IS" BASIS WITH NO OTHER WARRANTIES OF ANY KIND, AND, UNLESS OTHERWISE PRECLUDED BY LAW, LICENSOR DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

> **9.1 Disclaimer of Consequential Damages.** EXCEPT WITH RESPECT TO A PARTY'S INDEMNIFICATION OBLIGATOINS AS SET FORTH IN THIS AGREEMENT, NEITHER PARTY . . . SHALL BE LIABLE UNDER THIS TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL LOSS OR DAMAGES OR ANY OTHER SIMILAR DAMAGES UNDER ANY THEORY OF LIABILITY.

**9.2 Limitation of Liability.** EXCEPT WITH RESPECT TO LICENSOR'S INDEMNIFICATION OBLIGATION PURSUANT TO SECTION 11.1, BELOW, LICENSOR'S . . . TOTAL AGGREGATE LIABILITY TO CUSTOMER FOR ANY LOSS, COST, CLAIM OR DAMAGES OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL NOT EXCEED IN THE AGGREGATE THE AMOUNT OF FEES ACTUALLY PAID TO THE LICENSOR IN THE PREVIOUS TWELVE (12) MONTH PERIOD PRIOR TO THE INITIATION OF THE CLAIM BY CUSTOMER.

(*Id.* §§ 8.1, 9.1, 9.2.). The Agreement is governed by the laws of Illinois. (*Id.* ¶ 1.)

## II.     The Salo/Procura Agreement

Salo provides software implementation services for healthcare customers who are using Procura's software on their systems. (TPC ¶ 7.) In September 2014, Salo and Procura entered into a formal agreement ("Provider Agreement") which established Salo as a preferred, but non-exclusive, provider of services related to Procura's software. (*Id.* ¶¶ 8-9, 12 & Ex. A ("Provider Agreement"), Sept. 17, 2019, Docket No. 69-1.) The Provider Agreement contained the following terms and warranties:

> (1) "[Salo] is capable of providing Services that may be required by Procura's clients and represents that its employee personnel and contractors are sufficiently trained and knowledgeable to provide the Services;" (2) "All Services provided by [Salo] shall be pursuant to a separate agreement between [Salo] and the clients . . . who elect to obtain such Services;" and (3) "Each [a]greement entered into between [Salo] and a Procura client shall include a provision indicating that the client shall look solely to [Salo] for the provision of the Services and the results achieved therefrom."

(Provider Agreement §§ 2-3.)

The Provider Agreement contemplated that Salo and Procura would benefit from mutual customer referrals. (*See id.* §§ 4-5.) As such, it contains terms for royalty payments from each party to the other upon successful referrals. For each "[a]greement entered into between [Salo] and a client referred to by Procura," the Provider Agreement requires Salo to pay a royalty to Procura. (*Id.* § 4.) Likewise, "for fees for software and services billed and collected by Procura for new clients referred to Procura by [Salo]," Procura is required to pay a royalty to Salo. (*Id.* § 5.) Where a prospective client was "previously identified and contacted by Procura prior to [Salo's] submission of the customer name to Procura," Procura is not required to pay Salo royalty payments. (*Id.*) The Provider Agreement does not define "refer" or "referral."

The Provider Agreement also contains the following indemnification clause:

> [Salo] agrees to protect, defend, indemnify and hold Procura harmless from any and all claims, actions, suits, costs, losses, expenses, damages or liability whatsoever, whether direct or indirect . . . which Procura . . . may incur . . . as a result of, caused by or arising out of or in connection with, or contributed to, in whole or in part, directly or indirectly by: (i) [Salo's] failure to comply with the terms of this Agreement and/or violation of any federal, state or local law…; (ii) any illegal activities alleged to have been committed by, or involving [Salo]…; and/or (iv) the performance of any Services separately provided by [Salo], its agents, or employees.

(*Id.* § 9.) There is a similar clause indemnifying Salo in the case of Procura's breach, illegal activities, or separate performance of services. (*Id.*) The contract is governed by the laws of Ohio. (*Id.* § 12.)

### III. The Salo/Prairie River Agreement

Prairie River alleges that, after it entered into the Agreement with Procura, Procura informed Prairie River that Salo would conduct the implementation because Procura did not have the bandwidth to do so itself.  (SAC ¶¶ 34-35.)  The Agreement itself stated that "Professional Services shall be provided by Salo Solutions and they shall provide [Prairie River] with their own contract terms and conditions and [Prairie River] agrees to look solely to Salo Solutions with respect to the performance of such services and results obtained therefrom."  (Agreement at 14.)  The Agreement identifies the "Professional Services" that Prairie River would receive from Salo as separate from the maintenance support that Procura agreed to provide to Prairie River.  (*See* Agreement § 1.)[1]

Prairie River and Salo entered into their own, separate agreement for information technology consulting services (the "Salo/Prairie River Agreement" or "SPRA") on October 21, 2015.  (TPC ¶ 19 & Ex. B ("SPRA"), Docket No. 69-2.)  The SPRA does not define the scope of Salo's services to Prairie River, but instead contains a provision stating that for each engagement, "a document defining the scope of work ('Work Order') shall be prepared."  (SPRA § 1.1.)

On the same day they executed the SPRA, Salo and Prairie River executed a Work Order.  (TPC ¶ 23 & Ex. C ("Work Order), Docket No. 69-3.)  The Work Order described Salo's "technical and operational consulting" services and identified five objectives for its work with Prairie River: (1) [f]ocus . . . on a "knowledge transfer" to "assist in shaping the software to meet [Prairie River's] needs;" (2) build a Procura system "based on the unique

---

[1] "Maintenance Support" includes the Software Problem and Hardware support Procura agreed to provide to Prairie River.  (Agreement § 1.)

business operations and specifications of the Prairie River operation;" (3) "Train the Trainer," i.e. train Prairie River personnel to train other employees; (4) "provide a prioritized risk mitigation summary;" and (5) support a "'Procura lead' in training [Prairie River] offices during GO LIVE, and assist in transitioning [Prairie River] operations to Procura Support after GO LIVE." (Work Order at 3.)

## IV.  Software Failures at Prairie River

Although Procura had delivered a database to Prairie River by November 2015–within the 90-day window established by the Agreement–the Software wasn't functional at any Prairie River office until June 2016. (SAC ¶¶ 38, 40.) Prairie River alleges that six major categories of software failures occurred after the Software was implemented. (*See id.* ¶¶ 44-89.)

### i.  Point of Care Failures

In August and September, 2016, the Software went live at six Prairie River branches. (*Id.* ¶ 48.) Employees at those offices began to report missing documents due to failures in the Point of Care ("POC") synchronization process. (*Id.* ¶ 45, 48.) POC refers to a function that syncs clinical data to a central server from local PCs. (*Id.*) Although Prairie River had its own backup system, it could not retrieve the missing documents from that system. (*Id.* ¶ 48.) Prairie River initially believed the losses were caused by user error, but later realized that they were caused by a defect in the Software. (*Id.* ¶47-48.) As a result of that defect, Prairie River lost dozens of clinical documents and records. (*Id.* ¶ 51.)

Prairie River began reporting this problem to Procura in October 2016. (*Id.* ¶ 49.) Later that month, Procura identified and fixed a defect in the POC sync process. (*Id.* ¶ 50.) However, after implementation of an updated version of the Software ("Procura 8.2") approximately six weeks later, the problems with document synchronization and deletion began to reoccur. (*Id.* ¶ 53.) Prairie River alleges that Procura 8.2 was released without proper testing so that Procura could meet government requirements set to take effect in December 2016. (*Id.* ¶ 54.) Recognizing the new product's defects, Procura began releasing weekly updates, which Prairie River had to implement. (*Id.* ¶ 56.)

## ii. Pathways Failures

Pathways is a feature of the Software that was "designed to enable a clinician to build a custom client care plan from pre-configured options available in a database, as well as track the effectiveness of the care plans and make changes." (*Id.* ¶ 57.) Procura–not Salo–implemented and configured the Pathways component of the Software on Prairie River's systems. (*Id.* ¶ 34.) Prior to execution of the Agreement, Procura told Prairie River that similar organizations in the U.S. were using Pathways effectively. (*Id.* ¶ 58.) Procura's assurances about Pathways influenced Prairie River's decision to adopt the Software. (*Id.* ¶ 57.)

When Prairie River began using the Pathways feature, it discovered a defect that prevented healthcare providers from amending care plans electronically in the Pathways tool. Instead, they had to retype the changes in a separate document. (*Id.* ¶ 60.) This

defect created duplicative work, resulted in inaccurate transcriptions, and created regulatory risks.  (*Id.* ¶¶ 60-62.)

### iii.    Financial Management Failures

Procura's product descriptions described applications that would increase employee and administrative efficiency.  (*Id.* ¶ 63.)  Prairie River alleges that, in reality, Procura's financial management applications were incapable of functioning on their own.  (*Id.* ¶ 64.)  To perform properly, the applications required the purchase of additional tools from Salo–despite Procura's assurances to Prairie River during negotiations that products developed by Salo to enhance the Software were outdated and unnecessary.  (*Id.* ¶¶ 64-66.)

### iv.    Billing Units and Visits Failures

Procura's product descriptions and marketing materials described tools capable of handling the complex billing requirements typical of the healthcare industry.  (*Id.* ¶ 70.)  Its marketing materials specified that the Software would "immediately turn around electronic claims," "detect claim payments," and "generate pre-billing reports to identify errors prior to claim submission."  (*Id.*)  During negotiations, Procura personally assured Prairie River that the Software's billing components were a "strength." (*Id.* ¶ 69.)

Soon after Procura began implementing the Software on Prairie River's systems, Prairie River discovered several issues with the Software's billing services.  (*Id.* ¶ 71.)  First, the Software could not bill hourly services in 15-minute units or bill visit services as single visits.  (*Id.* ¶ 71.)  These are standard practices in home healthcare in the United States.  (*Id.*)  Because of these limitations, Prairie River had to implement a tool called

Extended Billing ("EB") for many of its customers. (*Id.*) That tool was also defective. For instance, despite Procura's prior assurances otherwise, the EB tool did not allow Prairie River to change the payer on an account via the Change Funder For Invoice ("CFFI") feature. (*Id.* ¶ 73.) Without CFFI, Prairie River had to call a Procura billing representative each time it needed to move an invoice to a new payer. (*Id.* ¶ 74.) Procura acknowledged that a defect prevented Prairie River from using CFFI. (*Id.* ¶ 75.)

Because these defects were impacting its business, in July or August 2016, Prairie River contacted Procura to ask for an update to the Software's billing functions. (*Id.* ¶ 77.) Procura did not fix the problems with unit-billing and CFFI until November 2016. (*Id.* ¶ 78.) Even after those fixes were made, other billing issues persisted. (*Id.* ¶ 78.)

Prairie River reports that billing-related defects caused its employees to work a total of 1,272.75 overtime hours and created delays in billing and collection. (*Id.* ¶ 79.) Consequently, its cash flow was strained and it was required to extend a credit line by $1 million. (*Id.* ¶ 80.)

v.    **Clinical Day View and OASIS Features**

During negotiations, Procura represented to Prairie River that the Software contained tools, including an assessment tool called OASIS, that would support clinician decision-making and accuracy of care. (*Id.* ¶¶ 82-83.) When Prairie River first received the Software in November 2015, however, it did not include any OASIS documents. (*Id.* ¶ 84.) To compensate, Prairie River developed OASIS documentation "from scratch." (*Id.* ¶ 85.)

The Software also contained a component called Clinical Day View, which organized the most relevant parts of clinical records.  (*Id.* ¶ 87.)  Some OASIS documents were created with Clinical Day View.  (*Id.*)  In December 2016, Procura released an update that resulted in the permanent loss of any OASIS document created with Clinical Day View.  (*Id.*)  Prairie River's backup system was unable to retrieve many of those documents and, as a result, they were permanently lost and had to be recreated from memory.  (*Id.* ¶¶ 87, 89.)

## V.     Communications with Procura

On November 14, 2016, Prairie River's CIO, Austin Figge, sent an email to Procura explaining that the defects with the Software's billing features were seriously threatening the business.  (*Id.* ¶ 94.)  In response, Procura installed Procura 8.2, which also had serious defects, in December 2016.  (*Id.* ¶ 95.)

Procura and Prairie River scheduled an emergency meeting in January 2017 to discuss the issues, but it was rescheduled for February 17, 2017, after Procura cancelled.  (*Id.* ¶ 96.)  At the February meeting, Procura promised Prairie River it would come up with a plan by February 20.  (*Id.* ¶ 98.)  When Procura failed to follow up, Figge sent another letter to Procura reiterating that Prairie River's business was in serious danger because of the Software's defects and demanding an immediate response.  (*Id.* ¶ 100.)  In the following weeks, six Prairie River employees resigned because of the difficulties with the Software.  (*Id.* ¶ 101.)  At that point, Prairie River decided it had to stop using the Software altogether.  (*Id.* ¶ 102.)

Prairie River alleges that Procura's faulty Software resulted in $800,000 in out-of-pocket expenses and more in lost profits.  (*Id.* ¶ 105.)  Prairie River also describes loss of personnel and a serious impact on staff morale.  (*Id.* ¶¶ 97, 105.)

Finally, Prairie River alleges that during sale negotiations, Procura knew that the Software was not ready for use in the U.S. because a Texas company had issues similar to those encountered by Prairie River.  (*Id.* ¶ 109.)  Prairie River further alleges that Procura failed to disclose the issues to Prairie River, intentionally concealed the identify of the Texas company from Prairie River, and made false promises about the Software's capabilities.  (*Id.* ¶¶ 109-10.)

## V.    Procedural History

Prairie River brought this action against Procura in Wright County, Minnesota.  (Notice of Removal at 1, Nov. 15, 2017, Docket No. 1.)  Procura removed the action to this Court on November 15, 2017.  (*Id.*)  On December 13, 2017, Prairie River filed an Amended Complaint, alleging: (I) Breach of Contract; (II) Breach of Warranty; (III) Rescission; and (IV) Fraudulent Inducement.  (Am. Compl., Dec. 13, 2017, Docket No. 23.)

Procura filed a motion to dismiss.  The Court denied the motion to dismiss with respect to Prairie River's fraudulent inducement claim, finding that Prairie River had satisfied the pleading requirements of Federal Rule of Civil Procedure 9(b).  (Order at 9, July 30, 2018, Docket No. 59.)  The Court also denied the motion to dismiss the breach of contract claim, finding that Article 2 of the UCC applies to the Agreement and that Prairie

River had stated a claim.  (*Id.* 15-16.)  With respect to the breach of warranty claim, the Court found that Prairie River had stated a claim for breach of express warranty, but that any claim for breach of the implied warranty of merchantability was insufficiently pleaded because Prairie River only implied that it was bringing such a claim.  (*Id.* at 22.)  The Court dismissed Prairie River's claim for rescission.  (*Id*. at 23.)  Finally, with respect to Prairie River's claims for consequential damages–including lost profits–the Court held that Prairie River had not sufficiently pleaded a theory of unconscionability and had not shown that a willful breach of contract renders an exclusion of consequential damages unenforceable under Illinois law.  (*Id.* at 25-26.)

Prairie River filed a Second Amended Complaint on August 31, 2018, alleging five Counts: I) Breach of Contract; (II) Breach of Express Warranty; (III) Breach of the Implied Warranty of Merchantability; (IV) Fraudulent Inducement; and (V) Violations of the Illinois Consumer Fraud Act.  Prairie River seeks monetary damages, including consequential damages.

On September 17, 2018, Procura filed a Third-Party Complaint against Salo Solutions, Inc., alleging: (I) Breach of Contract (Provider Agreement); (II) Indemnification; and (III) Breach of Contract (Salo/Prairie River Agreement).

On September 21, 2018, Procura filed a motion to dismiss Prairie River's claims for consequential damages and Counts III and V of the Second Amended Complaint.  (Mot. to Dismiss, Docket No. 73.)

On November 20, 2018, Salo filed a motion to dismiss the Third-Party Complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(4) or for judgment on the pleadings under Rule 12(c). (Mot. to Dismiss, Nov. 20, 2018, Docket No. 157.)

## ANALYSIS

### I.     Standards of Review

### i.     Rule 12(b)(6)

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "'claim to relief that is plausible on its face.'" *See, e.g.*, *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore must be dismissed. *Id.* The Court construes the

complaint in the light most favorable to the plaintiff, drawing all inferences in their favor. *Ashley Cty., Ark. v. Pfizer, Inc*., 552 F.3d 659, 665 (8th Cir. 2009).

In reviewing a motion to dismiss, the Court may consider the allegations in the complaint as well as "those materials necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

### ii.    Rule 12(c)

Judgment on the pleadings under Rule 12(c) is appropriate only where the moving party has clearly established that there are no material issues of fact and the moving party is entitled to judgment as a matter of law. *Pothoff v. Morin,* 245 F .3d 710, 715 (8th Cir. 2001). The Court must accept as true all facts as pleaded by the non-moving party and grant all reasonable inferences in that party's favor. *Id.*

## II.    Procura's Motion to Dismiss

### A.    Conversion to Motion for Summary Judgment

Prairie River has presented evidence outside the pleadings in its memorandum in opposition to Procura's motion to dismiss and asks the Court to treat the motion as a motion for summary judgment. Procura objects.

"Under Federal Rule of Civil Procedure 12(b), the Court may accept matters outside the pleadings and treat the motion as one for summary judgment where it would expedite resolution of the matter to do so." *McMaster v. State of Minn.*, 819 F. Supp. 1429, 1434 n. 1 (D. Minn. 1993). Because considering evidence outside the pleadings would not expedite resolution of this matter and defendants object to converting their motion into one for

summary judgment, the Court finds that it would be inappropriate to treat the motion as one for summary judgment. *See id.* The Court will therefore decline to consider evidence outside the pleadings.[2]

### B.  Prairie River's Claims for Consequential Damages

Procura moves to dismiss Prairie River's claims for consequential damages, citing the Agreement's damages and remedies limitation clauses. Because contractual limitations on remedies and exclusions of consequential damages are independent inquiries under Illinois law, the Court will assess the validity of the clauses separately. *See Razor v. Hyundai Motor America*, 854 N.E.2d 607, 622 (Ill. 2006).

### i.  Limitation on Remedies

Section 9.2 of the Agreement limits Procura's liability to the amount of fees paid by Prairie River in the twelve months preceding the notice of dispute. If valid, the effect of the section is to limit Prairie River's available remedies to a refund of the price paid for the Software (if paid in the preceding twelve months) and, accordingly, to exclude consequential damages. But if, as Prairie River argues, the limitation "fails of its essential purpose, it is as if that limitation of remedy does not exist for the purposes of the damages to which [Prairie River] is entitled." *Id.* at 618 (citing 810 ILC 5.2-719(2)).

"[W]hen a contract limits [a buyer's] remedy to return of the purchase price, the limited remedy fails of its essential purpose 'when goods have latent defects which are not

---

[2] The Court notes that it will consider those materials attached to or necessarily embraced by the pleadings, including the Agreement.

discoverable upon receipt and reasonable inspection.'"[3]  *PDC Laboratories, Inc. v. Hach Co.*, 2009 WL 2605270, at *4 (C.D. Ill. Aug. 25, 2009) (citing *Leprino v. Intermountain Brick Co.*, 759 P.2d 835, 836 (Colo. App. 1988)).  When the underlying good is "readily amenable to being returned to the seller before being used in a way that either consumed [the good] or involved [its] irreversible integration into something else," a refund remedy is less likely to fail of its essential purpose because the buyer has recourse to protect the value of her bargain.  *BAE Systems Info. & Electronics Systems Integration, Inc. v. SpaceKey Components, Inc.*, 2013 WL 149656, at *4 (D.N.H. Jan. 11, 2013).

Here, the Software's defects were only discoverable after the Software was incorporated into Prairie River's computer systems, which occurred between eight and ten months after execution of the Agreement.  The defects were not only latent, but of such a nature that Prairie River could not discover them until after it had spent considerable time, money, and other resources integrating the Software into its systems.  Moreover, Procura repeatedly assured Prairie River that it could fix the problems with the Software, leaving Prairie River with no way of knowing that new problems would arise with each update and attempted fix.  By the time Prairie River determined that it could not operate with the Software and abandoned it, more than twelve months had passed since it had paid Procura, which—under the limitation on remedies provision in the contract—would leave Prairie River with no remedy whatsoever.  Considering all the circumstances, the Court finds that

---

[3] The Court previously held that the Software is properly considered a good under the UCC.  (Order at 16, July 30, 2018, Docket No. 59.)

Prairie River has alleged facts sufficient to show that the limitation of remedy fails of its essential purpose.

### ii.    Damages Limitation Clause

The Court must next decide whether the Agreement's damages limitation clause requires dismissal of Prairie River's claims for consequential damages. Procura argues that the clause is unambiguous and enforceable, thus requiring dismissal of the claims. Prairie River counters that: (1) the clause is invalid as unconscionable; and (2) Procura's fraudulent conduct precludes it from disclaiming consequential damages.

### a.    Unconscionability

A contractual exclusion of consequential damages "is to be enforced unless unconscionable." *Razor*, 854 N.E.2d at 618 (citing 810 ILCS 5/2-719(3)). "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause." 810 ILCS 5/2-302.

Unconscionability may be procedural, substantive, or both. *Razor,* 854 N.E.2d at 622. "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Id.* "Factors to be considered are all the circumstances surrounding the transaction including the manner in which the contract was entered into [and] whether each party had a reasonable opportunity to understand the terms of the contract." *Frank's Maint. & Eng'g, Inc. v. C.A. Roberts Co.*,

408 N.E.2d 403, 410 (Ill. App. 1980). "Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed. Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party [and] an overall imbalance in the obligations and rights imposed by the bargain." *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 267 (Ill. 2006) (quoting *Maxwell v. Fidelity Fin. Servs., Inc.*, 907 P.2d 51, 58 (Ariz. 1995)).

Prairie River argues that the Agreement's consequential damages exclusion is both procedurally and substantively unconscionable. With respect to procedural unconscionability, Prairie River argues that it entered the contract in an unfair bargaining position. Prairie River points to several factors, including Procura's sophistication relative to Prairie River, the pressure that Procura placed on Prairie River to enter the contract by September 30, and Prairie River's inability to discover defects in the Software prior to entering the contract due to Procura's alleged concealment of issues the Software had already caused for another company. Prairie River also argues that the clause is substantively unconscionable because, when implemented alongside the limitation on remedy, it would deprive Prairie River of any remedy for Procura's breach.

Viewing the facts in the light most favorable to Prairie River, the Court finds that Prairie River has pleaded facts sufficient to show that the Agreement's consequential damages exclusion is procedurally and substantively unconscionable. Considered together, the circumstances surrounding the execution of the Agreement suggest that Prairie River may not have had a reasonable opportunity to fully understand what it was agreeing to, including the nature of the product it contracted to buy, rendering the clause

21

procedurally unconscionable. Of particular concern are the allegations that Procura placed pressure on Prairie River to enter the Agreement by September 30, 2015, and that Procura concealed known defects from Prairie River. Had Prairie River had more time to learn about the Software, explore references, and become informed of possible defects, it may have been in a different—and fairer—bargaining position. Additionally, because the consequential damages exclusion could leave Prairie River without any remedy, the Court finds it plausible that the clause is unreasonably favorable to Procura, and thus substantively unconscionable.

*Lefebvre Intergraphics v. Sanden Machine Limited*, which Procura asks the Court to rely on, does not compel a different conclusion. 946 F. Supp. 1358 (N.D. Ill. 1996). In that case, the plaintiff, a commercial printer, bought a printing press from the defendant pursuant to a contract. *Id.* at 1361. Prior to the sale, the defendant had represented that the printing press would operate in a "commercially reasonable manner," but failed to disclose that another customer had encountered problems with the same model in the past. *Id.* at 1363. The printer did not function properly, and the defendant's attempted repairs were unsuccessful. *Id.* at 1361-62. There, as here, the parties' contract included a consequential damages exclusion. *Id.* at 1370. The defendant moved to dismiss the plaintiff's claims for consequential damages. *Id.*

The *Lefebvre* court held that the contract's consequential damages exclusion was not unconscionable. *Id.* at 1372. The court noted that both parties were sophisticated businesses and that "nothing in [the] complaint indicate[d] any disparity in bargaining power." *Id.* The court also found it implausible that the plaintiff did not foresee the

possibility of the printer's malfunction and expressed doubt as to the claim that the defendant acted in bad faith. *Id.*

As an initial matter, *Lefebvre* is not binding on this Court. Moreover, it is distinguishable from the present case in key respects. The plaintiff in *Lefebvre* did not allege facts showing a disparity in bargaining power. *See id.* Here, Prairie River **has** alleged facts showing that it was in an unfair bargaining position, including that Procura intentionally concealed information about the Software that it had no way of uncovering on its own. And unlike Prairie River, the plaintiff in *Lefebvre* was as commercially sophisticated as the seller. *Id.* at 1372. Finally, there is no indication that the *Lefebvre* plaintiff was under any undue pressure to contract within a certain time frame, as Prairie River alleges it was in 2015.

Accordingly, the Court will deny Procura's motion to dismiss Prairie River's claims for consequential damages.

### b. Effect of Procura's Alleged Fraud on Consequential Damages

Having determined that Prairie River's claims for consequential damages may proceed under a theory of unconscionability, the Court will discuss only briefly whether Procura's alleged fraud precludes it from disclaiming consequential damages.

It is well-settled that under Illinois law, "an exculpatory clause cannot protect persons from the results of their willful and wanton misconduct," including fraud. *Zimmerman v. Northfield Real Estate Inc.*, 510 N.E.2d 409, 415 (Ill. Ct. App. 1986). In an Order on a previous motion to dismiss in this case, the Court found that Prairie River had

stated a claim for fraudulent inducement.  Thus, to the extent that Procura attempts to dismiss Prairie River's claims for consequential damages arising from Procura's allegedly fraudulent conduct, its motion must be denied.

### C.     Breach of the Implied Warranty of Merchantability

Procura next moves to dismiss Prairie River's claim of breach of the implied warranty of merchantability, pointing to the Agreement's express disclaimer of implied warranties.  The Court must decide whether the warranty disclaimer requires dismissal of Prairie River's claim or, as Prairie River argues, Procura's alleged fraud precludes it from relying on that disclaimer to escape liability for breach of the warranty.

Prairie River relies in part on *Zimmerman v. Northfield*, where an Illinois court held that the defendant could not rely on an exculpatory clause to protect it from liability for fraud.  510 N.E.2d at 164.  Similarly, in *Bauer v. Giannis*, an Illinois court held that an "as is" clause was ineffective as a defense to fraud.  *Bauer v. Giannis*, 834 N.E.2d 952, 961 (Ill. Ct. App. 2005).[4]

*Zimmerman* and *Bauer* are distinguishable from the present case because Procura does not attempt to use the warranty disclaimer to escape liability for fraud.  Instead, Procura raises the disclaimer in response to a breach of warranty claim.  But nothing in *Zimmerman*, *Bauer*, or other law out of Illinois establishes that fraud renders a warranty disclaimer ineffective **against a breach of warranty claim**.  The Court has found only

---

[4] Courts in other jurisdictions have similarly concluded that defendants may not use exculpatory clauses to shield themselves from liability for fraud or other claims involving scienter or bad faith. *See, e.g.*, *TBG, Inc. v. Bendis*, 845 F. Supp. 1459, 1462 (D. Kan. 1994); *Turkish v. Kasenetz*, 27 F.3d 23, 27-28 (2d Cir. 1994).

two cases, neither of which is binding here, holding that a seller's misrepresentations about its goods renders an otherwise valid warranty disclaimer ineffective. *See Sorchaga v. Ride Auto, LLC*, 893 N.W.2d 360, 375 (D. Minn. 2017); *Murray v. D & J Motor Co., Inc.*, 958 P.2d 823, 830 (Okla. Civ. App. 1998).

Because the Court must apply the law of Illinois, the disclaimer is conspicuous, and the Agreement explicitly disclaims the implied warranty of merchantability, the Court will dismiss Count III of Prairie River's Second Amended Complaint with prejudice. *See, e.g.*, *Semitekol v. Monaco Coach Corp.*, 582 F. Supp. 2d 1009, 1026 (N.D. Ill. 2008) ("Illinois law allows a party to disclaim the implied warranty of merchantability in writing if the disclaimer is conspicuous and either mentions the term 'merchantability' or uses language like 'as is.'").

### D.    Illinois Consumer Fraud Act

Lastly, Procura moves to dismiss Prairie River's claim under the Illinois Consumer Fraud Act ("ICFA"). The Court must decide whether Prairie River has standing to sue under the ICFA despite its status as a non-Illinois consumer.

Non-Illinois consumers may pursue an action under Illinois's Consumer Fraud Act against a resident when "the circumstances relating to the transaction occur[ed] primarily and substantially within that state." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 854 (Ill. 2005). This is a fact-specific inquiry, and there is no "single formula or bright-line test." *Id.* However, relevant considerations include:

> (1) the claimant's residence; (2) the defendant's place of
> business; (3) the location of the relevant item that is the

> subject of the disputed transaction; (4) the location of the claimant's contacts with the defendant; (5) where the contracts at issue were executed; (6) the contract's choice of law provisions, if there are any; (7) where the allegedly deceptive statements were made; (8) where payments for services were to be sent; and (9) where complaints about the goods or services were to be directed.

*Haught v. Motorola Mobility, Inc.*, 2012 WL 3643831, at *3 (N.D. Ill. Aug. 23, 2012).

Here, the circumstances relating to the allegedly fraudulent transaction occurred in both Minnesota and Illinois. Because Procura is an Illinois company, the Court infers that communications relating to the transactions occurred in part in Illinois. Certain demonstrations of the Software that occurred leading up to the sale also appear to have occurred in Illinois. Additionally, the Agreement contained an Illinois choice-of-law clause. Finally, the Court infers that because Procura is based in Illinois, any fraudulent or deceptive ideas involved in the transaction were created in Illinois.

While these factors are significant, they do not establish that the circumstances relating to the transaction occurred **primarily and substantially** in Illinois. As an initial matter, many of the communications that occurred in Illinois also occurred, by necessity, at Prairie River's places of business in Minnesota. More importantly, Procura representatives traveled to Minnesota twice in September 2015 to encourage Prairie River to finalize the sale. Based on the pressure that Procura allegedly placed on Prairie River during those visits to execute a contract, in the Court's view, the visits were a key part of the series of events that make up the fraudulent transaction. Finally, the Agreement was executed in Minnesota, and Prairie River experienced the harm resulting from it in Minnesota. Accordingly, the Court concludes that the circumstances relating to the

transaction occurred primarily and substantially in Minnesota, not Illinois. The Court will therefore dismiss Prairie River's Claim under the ICFA with prejudice.

## III.    Salo's Motion to Dismiss

Salo moves to dismiss Procura's Third Party Complaint in full pursuant to Rule 12(b)(6), or for improper venue; or, alternatively, for judgment on the pleadings pursuant to Rule 12(c). Salo argues that, because it referred Procura to Prairie River, the terms of the Provider Agreement upon which Procura bases its claims do not apply. The Court agrees.

In Count I, Procura claims that Salo breached the Provider Agreement by misrepresenting that Salo was "capable of providing Services that may be required by Procura's clients." Procura also points out that the Provider Agreement required Salo to include a provision in each agreement it entered with Procura's clients requiring the client to "look solely to [Salo] for the provision of the Services and the results achieved therefrom." As defined in the Provider Agreement, those "Services" include "consulting, training, and intellectual property solutions."

"[C]ontracts should be read and understood according to the natural and most obvious import of the language, without resorting to subtle and forced constructions . . . ." *Slingluff v. Weaver*, 64 N.E. 574, 576 (Ohio 1902). When interpreting a contract, courts should "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953

N.E.2d 285, 292 (Ohio 2011). Accordingly, courts must give common, undefined words their ordinary meaning. *Padula v. Wagner*, 37 N.E.3d 799, 807 (Ohio Ct. App. 2015).

A straightforward reading of the Provider Agreement establishes that Salo's representations about the quality of its Services are intended to apply when Salo provides Services to **Procura's clients**. Indeed, the contract begins with the statement that "Procura may from time to time refer **its clients to [Salo]** . . . to perform [Services]." Following that statement is Salo's assertion that it "is capable of providing Services that may be required by Procura's clients." Accordingly, Salo's representations would undoubtedly apply where Procura referred an existing client to Salo and Salo agreed to provide Services to that client. But the Court fails to see how the same terms would apply where, as is true in this case, Salo referred Procura to a client and that client later bought software from Procura. If that were true, it would expose Salo to liability any time Salo made a referral to Procura, which makes little sense in the context of an agreement that the parties assert was intended to be mutually beneficial. The Court will not adopt such a strained reading of the contract.

Count II fails for similar reasons. Procura alleges that, to the extent Prairie River suffered damages as a result of Procura's breach or misconduct, the Provider Agreement requires Salo to indemnify Procura. According to Procura's reading of the Provider Agreement, Salo agreed to indemnify Procura for any damages that arose "in connection with the implementation project." That reading is both contrary to the language of the contract and illogical. The Provider Agreement requires Salo to indemnify Procura against damages arising out of or in connection to: (i) Salo's failure to comply with the terms of the Provider Agreement; (ii) Salo's use of Third Party Development tools; and (iii) Salo's

separate performance of Services or failure to adequately perform such Services. Because Salo's obligations under the Provider Agreement arise when Procura refers its clients to Salo, it follows that Salo is required to indemnify Procura when Procura makes a referral and Salo then breaches the Provider Agreement. Alternatively, Salo may be required to indemnify Procura when Salo separately and inadequately provides services to a client and that client brings an action against Procura based on those services. Neither of those scenarios has played out here. Moreover, the Court notes that the obvious intent of the indemnification clause is to allow Procura to refer new clients to Salo without putting itself at risk of additional liability, not to ensure that Salo indemnifies Procura against damages in any situation where both companies provide services to the same client.

In Count III, Procura alleges that Salo breached the Salo/Prairie River Agreement by failing to live up to the warranties and representations it made to Prairie River. Although Procura is not a party to that agreement, it argues that it is a third-party beneficiary and is therefore entitled to damages as a result of Salo's breach. Under Ohio law, a third party may enforce a contract when it shows that it is an intended, rather than incidental, beneficiary to it. *Grant Thornton v. Windsor House, Inc.*, 556 N.E.2d 1220, 1223 (Ohio 1991). Procura argues that it was entitled to royalty fees as a result of Salo's contract with Prairie River and that it is therefore a third-party beneficiary. Yet the Provider Agreement unambiguously states that Procura is entitled to royalty fees only when Procura successfully refers Salo to a client. Here, Salo–not Procura–made the referral. Procura does not allege otherwise. As such, Procura is not a third-party beneficiary to the Salo/Prairie River Agreement.

Even if the Court accepted Procura's reading of the Provider Agreement, the TPC would still fail to meet pleading standards. On a motion to dismiss, the Court accepts factual allegations as true, but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted). Here, Procura has pleaded virtually no factual content to support its claims, but instead makes conclusory statements about Salo's alleged breaches.

In Counts I and II, Procura alleges that Salo was responsible for misconduct that occurred in connection with the Software implementation project and that Salo misrepresented that it was capable of providing Services to Prairie River. However, Procura does not allege any facts showing that the Services Salo provided were inadequate, that its employees were ill-prepared, or that it was otherwise at fault for the Software's failures at Prairie River's facilities. Likewise, Procura relies on the provision in the Provider Agreement stating that when Salo provides Services to Procura's clients, the client should "look solely to [Salo] for the provision of Services and the results achieved therefrom." But Procura has not alleged facts showing that difficulties Prairie River experienced with the Software were related to Salo's Services.

Similarly, even if Procura were a third-party beneficiary to the Salo/Prairie River Agreement, Count III of the TPC would fail because Salo has not alleged facts showing that Salo breached that agreement. Accordingly, the Court will dismiss Procura's Third-Party Complaint without prejudice.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Dismiss [Docket No. 73] is **GRANTED with prejudice** as to Counts III and V of the Second Amended Complaint and **DENIED** as to Plaintiff's claims for consequential damages.

2. Third-Party Defendant Salo's Motion to Dismiss [Docket No. 157] is **GRANTED without prejudice**.

DATED:  July 10, 2019
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court