## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

|  |  |
|---|---|
| Prairie River Home Care, Inc., | Case No. 17-cv-5121 (JRT/HB) |
| Plaintiff, |  |
| v. |  |
| Procura, LLC, | **ORDER AND REPORT AND RECOMMENDATION** |
| Defendant, Third-Party Plaintiff, | **FILED UNDER SEAL** |
| v. |  |
| Salo Solutions, Inc., |  |
| Third-Party Defendant. |  |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on two motions for sanctions brought by Plaintiff Prairie River Home Care, Inc., against Defendant and Third-Party Plaintiff Procura, LLC [Doc. Nos. 225, 271]; Third-Party Defendant Salo Solutions, Inc.'s motion for sanctions against Procura [Doc. No. 240], and Procura's motion to amend the scheduling order [Doc. No 279].[1]  This matter has been referred for the resolution of pretrial matters pursuant to 28 U.S.C § 636(b)(1) and District of Minnesota Local Rule 72.1.  For the reasons stated below, the Court will grant in part and deny in part Prairie River's first motion for sanctions.  To the extent the Court believes that appropriate sanctions include

---

[1] Procura also sought in the same motion to compel further discovery responses from Salo, but that part of the motion was withdrawn.  *See* (Apr. 10, 2019, Letter [Doc. No. 304].)

limitations on the evidence to be admitted on summary judgment or at trial, the Court makes recommendations for consideration by the Honorable John R. Tunheim, United States Chief District Judge.  In addition, the Court will grant Prairie River's second motion for sanctions and will grant in part Salo's motion for sanctions insofar as both motions relate to Procura's unilateral cancelation of a private mediation that had been scheduled in accordance with the Court's scheduling order.[2]  The Court will deny the remainder of Salo's motion for sanctions to the extent it is moot as a result of Judge Tunheim's recent order dismissing Procura's third-party complaint against Salo in its entirety.  (Mem. Op. & Order [Doc. No. 441].)  Finally, the Court will deny Procura's motion to amend the scheduling order for the purpose of taking additional discovery, the Court will extend the discovery deadline to the extent reasonably necessary for the limited purpose of effectuating its rulings on Prairie River's motion.

I.     BACKGROUND

Prairie River's allegations against Procura, and Procura's against Salo, are set forth in detail in Judge Tunheim's recent order.  (Mem. Op. & Order at 3–14.)  In addition, that order describes the procedural history of this case with regard to the pleadings.  (*Id.* at 14–15.)  For the sake of brevity that history will not be repeated here, so the Court turns directly to the discovery disputes that underlie the instant motions.

---

[2] Prairie River's second motion for sanctions also requested that Procura not be allowed to conduct discovery after the discovery deadline, *see* (Prairie River's Mem. in Supp. of Second Mot. for Sanctions [Doc. No. 273 at 15–16]).  The Court addresses that issue in connection with Procura's motion to amend the scheduling order.

A.     **Prairie River's Discovery Disputes with Procura**

In its first motion for sanctions, Prairie River contends that Procura failed to adequately prepare the corporate witnesses that it designated to testify in response to Prairie River's notice of Rule 30(b)(6) deposition.  *See generally* (Prairie River's Mem. in Supp. of First Mot. for Sanctions [Doc. No. 227].)  In supplemental briefing in support of the same motion, Prairie River also argues that Procura should be sanctioned for not producing until April 5, 2019—after the deadline for the close of discovery—information that the Court had ordered it to produce in response to previous motions to compel.[3]  *See generally* (Prairie River's Suppl. Mem. in Supp. [Doc. No. 317].)

The Court has held multiple hearings, conducted conferences with the parties, and written extensively on the prior discovery disputes that have plagued this case.  *See, e.g.*, (Doc. Nos. 53, 56, 181, 194, 195, 204, 205, 219.)  The Court recounts here the salient history to the extent necessary to provide context for the instant motions.

1.     **Procura's Responses to Prairie River's Written Discovery Requests Regarding Customers with Similar Issues**

Prairie River served its First Set of Interrogatories and Requests for Production of Documents to Procura on February 8, 2018.  (Abbate-Dattilo Decl. Ex. D [Doc. No. 143-1 at 19][4]; Abbate-Dattilo Decl. [Doc. No. 318 ¶ 3].)  On April 10, 2018, Prairie River

---

[3] As mentioned above, Prairie River's second motion primarily seeks sanctions for Procura's decision to cancel a private mediation that had been scheduled by the parties pursuant to this Court's December 6, 2018, amended scheduling order [Doc. No. 184]. *See* (Prairie River's Second Mot. for Sanctions.)   Since Salo's motion seeks similar relief, the Court will discuss those motions together later in this Order.

[4] There have been numerous declarations with even more numerous exhibits filed in support of various motions before the Court in this case.  For ease for reference, the Court

sent Procura a deficiency letter outlining the interrogatories and document requests it believed needed supplementation. (Abbate-Dattilo Decl. Ex. F [Doc. No. 143-1 at 56–59]; Abbate-Dattilo Decl. [Doc. No. 318 ¶ 3].) Among these was Interrogatory No. 7,[5] which sought identification of customers that "terminated a license agreement with Procura due to dissatisfaction with the software." Abbate-Dattilo Decl. Ex. E [Doc. No. 143-1 at 39].) Prairie River and Procura conducted a meet-and-confer via telephone on April 23, 2018, *see* Abbate-Dattilo Decl. Ex. H [Doc. No. 143-1 at 64–65], during which Prairie River identified At Home Healthcare, Inc. ("At Home") as an example of a Procura customer that Prairie River believed had experienced "similar issues with the Software as Prairie River, and who had not been disclosed in Procura's Interrogatory Answers." (Abbate-Dattilo Decl. [Doc. No. 318 ¶ 3].) On May 15, 2018, Procura served Amended Answers identifying At Home in response to Interrogatory No. 7, but did not identify any other such customers. (*Id.*)

---

refers to the declarations by the name of the declaration and the docket number. In addition, the exhibits attached to the respective declarations were generally filed as a single attachment; therefore, unless otherwise indicated, when the Court refers to a specific page of an exhibit, it is referring to the CM/ECF pagination.

[5] Interrogatory 7 is provided by way of example to illustrate the contours of the dispute between Prairie River and Procura. Prairie River has also asserted that Procura's answers to other interrogatories were insufficient. *See, e.g.*, (Prairie River's Suppl. Mem. in Supp. [Doc. No. 317 at 5–6].) These disputes also implicate various requests for production, such as Request No. 24, which sought documents pertaining to complaints by Procura customers, and Request No. 26, which sought communications from "current or former Procura customers who have cancelled or terminated a license or similar agreement with Procura due to dissatisfaction with the Software." (Abbate-Dattilo Decl. Ex. E [Doc. No. 143-1 at 52].)

Additional meet and confer efforts and telephone conferences with the Court were conducted during May and June of 2018. *See* (Abbate-Dattilo Decl. Ex. I [Doc. No. 143-1 at 67–68]; Ex. K [Doc. No. 143-1 at 77–81]; Ex. M [Doc. No. 143-1 at 86–88].) This process eventually resulted in two Informal Dispute Resolution ("IDR") conferences before the Court. *See* (June 4, 2018, IDR Conference Minute Entry [Doc. No. 53]; June 26, 2018, IDR Conference Minute Entry [Doc. No. 56].) In the June 4 IDR conference, the Court concluded that the "disputes were not yet ripe for resolution," and provided additional guidance in an attempt to narrow the issues. (June 4, 2018, IDR Conference Minute Entry at 1.) Specifically, the Court instructed the parties to "meet and confer about the appropriate scope of discovery, including, *inter alia*, the types of complaints raised by other customers that may be relevant to the allegations made in the Complaint, the relevant software versions, and the timeframe for discovery." (*Id.*) Further, the Court instructed Procura to "clearly indicate in any supplemental responses the specific parameters of the discovery it is producing, as well as whether and to what extent documents are being withheld on the basis of objections, so that the scope of production is clear." (*Id.* at 2.)

In the June 26 IDR conference, the Court ordered Procura to supplement its responses in several respects, including to "provide to Plaintiff on or before July 17, 2018, a list of customers for whom problems or issues of the same type as those identified in the list provided by Plaintiff's counsel were reported during implementation." (June 26, 2018, IDR Conference Minute Entry at 1.)

On August 2, 2018, Prairie River sent Procura another e-mail inquiry requesting an update about the status of its efforts to supplement its responses in compliance with the Court's order. (Abbate-Dattilo Decl. Ex. O [Doc. No. 143-1 at 92–93].)  On August 3, 2018, Procura responded that it was busy collecting information that it expected to produce the week of August 10 and that it believed would resolve "most if not all of the . . . issues."  (Abbate-Dattilo Decl. Ex. O [Doc. No. 143-1 at 92].)  When the promised supplementation did not materialize, Prairie River emailed Procura yet again on September 5. (Abbate-Dattilo Decl. Ex. P [Doc. No. 143-1 at 95–96].)  Procura stated it was still collecting information and that its supplementation would occur the week of September 10. (*Id*. at 95.)

On September 17, 2018, Prairie River emailed Procura reminding it of its promise to supplement and stated that, under the circumstances, the deadline by which to add claims for punitive damages should be amended. (Abbate-Dattilo Decl. Ex. Q [Doc. No. 143-1 at 100].)  The parties entered into a stipulation pursuant to which Procura promised to supplement its responses by September 20, 2018, and the deadline for Prairie River to move to amend its complaint to add a claim for punitive damages was extended to November 5, 2018. *See* (Stipulation [Doc. No. 80 at 2]; Order [Doc. No. 82].)

Also at about this time, Prairie River had "learned of another Procura customer who had not been identified by Procura that experienced the same or similar defects or

deficiencies with Procura's Software—Small Hands, Big Hearts Pediatric Therapy

Management, LLC ('Small Hands')."[6]  (Abbate-Dattilo Decl. [Doc. No. 318 ¶ 4].)

By October 30, Procura still had not supplemented as promised.  Accordingly,

Prairie River sent one final letter on October 30, recounting the history of the dispute and

stating that if Procura failed to supplement its responses, Prairie River would bring a

motion to compel. (Abbate-Dattilo Decl. Ex. R [Doc. No. 143-1 at 102.)  Procura

provided some additional information on November 2, *see* (Abbate-Dattilo Decl. No. 143

Ex. S [Doc. No. 143-1 at 109–14]), but Prairie River found the supplementation

inadequate and filed a motion to compel on November 7, 2018.  (Mot. to Compel [Doc.

No. 140].)  In that motion, Prairie River contended Procura had not produced responsive

information pertaining to six topics: (1) Procura's customers in the United States that had

transitioned from Riversoft to Procura's software; (2) Procura's customers that had

indicated to Procura dissatisfaction with Procura's software; (3) Procura's customers that

use the Procura software to bill Medicare; (4) Procura's customers that have used the

software's "Pathways" feature; (5) financial statements and sales goals for the third

quarter of 2015 and quarterly and monthly financial statements for 2015 and 2016; and

(6) citation to the specific documents among Procura's production that Procura

---

[6] Prairie River's CFO contacted a representative of Small Hands "to determine the scope
of Small Hands' issues with Procura's Software."  (Abbate-Dattilo Decl. No. 318 ¶ 4.)
After hearing that Small Hands' issues with Procura's software "were very similar to the
defects and deficiencies Prairie River experienced," Prairie River deposed Small Hands'
owners on November 30, 2018.  (*Id.*)

considered to be the "contract documents."[7]  *See* (Mem. in Supp. of Mot. to Compel [Doc. No. 142 at 8–9].)  On the topic of Procura's customers who had experienced similar problems with its software, Prairie River maintained that "[a]s of November 28, 2018, the only customer identified by Procura in its Answers to Prairie River's Interrogatories was At Home, despite Prairie River's demands that Procura identify Small Hands."  (Abbate-Dattilo Decl. No. 318 ¶ 5.)  Prairie River also sought its fees and costs incurred in bringing the motion to compel. (Mot. to Compel at 1.)

The Court granted the motion in part from the bench and in part by subsequent written order.  *See* (Nov. 28, 2018, Minute Entry [Doc. No. 181]; Jan. 9, 2019, Order [Doc. No. 194].)  The Court ordered Procura to supplement its responses to Prairie River's requests in a number of respects, including production of all documents in the 2010 to 2016 timeframe reflecting communications with customers about complaints similar to those identified on a list previously provided by Prairie River's counsel[8] (Request No. 23), and identification of all customers that had cancelled or terminated their license agreements during the period 2010 to 2017 because of one or more

---

[7] The motion also contemplated a seventh category, but at the hearing before the undersigned, it became clear that it was no longer at issue.

[8] At Procura's request during the parties' meet and confer efforts, Prairie River identified five categories of issues it claimed to have had with Procura's software; within each category it identified several specific issues.  The broad categories were: (1) "Transition/ Implementation"; (2) "Billing Defects"; (3) "Technical Defects (synch and updates)"; (4) "Clinical Defects (pathways and clinical day view)"; and (5) "Procura's capability in the U.S. Market - Procura's U.S. clients complaints/questioning capability." (Abbate-Dattilo Decl. Ex. F [Doc. No. 318-1 at 40].)

deficiencies in the software similar to those identified on that list (Interrogatory No. 7).[9]
*See* (Nov. 28, 2018, Minute Entry.)  In addition the Court granted Prairie River's request
for attorneys' fees and costs, noting that it had granted Prairie River's motion in most
respects, that "there was no substantial justification for many of the objections made,"
and that "Procura's responses and objections made it difficult if not impossible for Prairie
River to determine whether and to what extent it had received complete responses."  (Jan.
9, 2019, Order at 2–3.)

On December 20, 2018, Procura served amended answers to Prairie River's first
set of interrogatories.  *See* (Abbate-Dattilo Decl. Ex. H [Doc. No. 229-1 at 92–103].)  In
its amended answers—provided in response to the Court's November 28 Order—Procura
identified additional customers that allegedly reported issues with its software, namely,
Personal Assistance Services of Colorado, LLC ("PASCO"); Small Hands, Big Hearts
Pediatric Therapy Management, LLC; and Interim Healthcare Ohio.  *See* (*id.* at 94, 100–
102); *see also* (Prairie River's Mem. in Supp. of First Mot. for Sanctions at 14.)  On
January 15, 2019, Prairie River sent Procura an email expressing concern about the fact
that it had taken Procura more than a year and a half to identify PASCO in response to
Interrogatory No. 7 when PASCO had raised "the same issues as Prairie River at the
same time Prairie River was sending its . . . emails to Procura," and therefore could and

---

[9] The Court emphasized that Procura must conduct a "reasonably diligent search" for
information and documents, and that required searching in those locations likely to
contain responsive information or documents and asking those individuals likely to know
where responsive information or documents are located.  (Nov. 28, 2018, Minute Entry at
2 n.1.)  Further, the Court instructed Procura to "use a search methodology that is
reasonably designed to identify responsive documents from those sources."  (*Id.*)

should have been identified much sooner.  In part due to Procura's delinquency in

producing this information and in part due to the incompleteness of Procura's prior

responses about customers who had voiced similar complaints, Prairie River expressed

concern that Procura had still not fully complied with the Court's November 28 order,

and queried whether there were still more complaining customers who had not yet been

disclosed by Procura.  *See* (Abbate-Dattilo Decl. Ex. A [Doc. No. 318-1 at 2].)

Indeed, Prairie River through its own investigation discovered additional

customers that it contends should have been identified in response to Interrogatory No. 7.

For example, on an Excel spreadsheet in a Procura document production, Prairie River

found a reference to Wesley Homes that suggested Wesley Homes had experienced

issues with "software functionality," but the documents provided no other details.

(Abbate-Dattilo Decl. [Doc. No. 318 ¶ 6]; *see also* Abbate-Dattilo Decl. Ex. N [Doc. No.

234 at 5].)  On February 4, 2019, Prairie River called the former owner of Wesley

Homes, who said that Procura's billing functionalities had been "highly problematic" and

that Wesley Homes had written off "'many hundreds of thousands of dollars'" as a result.

(Abbate-Dattilo Decl. [Doc. No. 318 ¶ 6].)

This led to another meet-and-confer between the parties on February 4, 2019, in

which Prairie River raised questions "about how customers were identified in response to

Prairie River's Interrogatories."  (*Id.* ¶ 7.)  Prairie River "also specifically asked about

Wesley Homes, Nursing Placement Home Healthcare Services, Inc., and Accent on

Independence, and whether these entities also should have been disclosed in Procura's

Amended Answers pursuant to the Court's November 28, 2018 Order."  (*Id.*)  Prairie

River asserts that Procura "represented they would look into these specific customers." (*Id.*)  However, "[a]t no point following that conversation did Procura identify any of these three additional customers through an Amended Interrogatory Answer or otherwise."  (*Id.*)

On March 1, 2019, Prairie River propounded additional interrogatories and requests for production specifically targeting Wesley Homes, Nursing Placement Home Healthcare Services, Inc., and Accent on Independence.  (Hr'g Tr. [Doc. No. 311 at 106]; Abbate-Dattilo Decl. Ex. B [Doc. No. 318-1 at 9–17].)  Procura responded on April 1, initially objecting that the discovery requests were untimely under the operative scheduling order and Federal Rule of Civil Procedure 6(a)(1)(c).  (Hr'g Tr. at 106; Abbate-Dattilo Decl. Ex. B [Doc. No. 318-1 at 9–17].)  But after an exchange of emails on that subject, Procura agreed to "supplement our discovery responses and produce corresponding documents by Friday."  (Abbate-Dattilo Decl. Ex. C [Doc. No. 318-1 at 21–27]; Ex. D [Doc. No. 318-1 at 29].)

Procura did supplement its responses, but Prairie River remained unpersuaded that Procura's response complied with the Court's November 28 Order.  (Prairie River's Suppl. Mem. in Supp. at 4–6.)  For instance, despite the Court's November 28 Order requiring that Procura produce all "communication[s] by an attorney on behalf of a current or former customer of its software seeking relief or threatening legal action," (Nov. 28 Order at 2), Prairie River asserts Procura produced for the first time on April 5, 2019, after the close of discovery, communications from attorneys claiming to represent one of Procura's former customers that allege Procura wrongfully induced it "into signing

the license agreement." (Prairie River's Suppl. Mem. in Supp. at 4; *see also* Abbate-Dattilo Decl. Ex. G [Doc. No. 319].)

Furthermore, Prairie River contends Procura "decided to take a narrow approach to Prairie River's Fourth Request for Production of Documents, producing only the actual termination letters and follow-up communications, while excluding most, if not all, correspondences between the customer and Procura's employees which would have necessarily led up to the termination." (Abbate-Dattilo Decl. [Doc. No. 318 ¶ 16].) Specifically, Prairie River asserts that it is not clear from Procura's April production "why Nursing Placement Home Healthcare Services, Jewish Senior Life, El Paso Nursing Services Home Health, Inc., and Hospice of the Valley cancelled their license agreements with Procura," (*id.*), and that the production as to all identified customers generally "does not provide a complete picture of the issues that led up to their terminations." (*Id.*) In short, Prairie River argues, the information Procura produced—belatedly—in April in response to Prairie River's Fourth Request for Production should have been produced months earlier in compliance with the Court's November 28 order, and there is reason to believe it is still incomplete.

### 2. Prairie River's 30(b)(6) Deposition of Procura

#### a. The Noticed Topics and Procura's Response

On October 31, 2018, Plaintiff noticed a 30(b)(6) deposition of Procura to be held at the offices of Prairie River's counsel in Minneapolis on December 4, 2018. The notice demanded that Procura

designate one or more officers, directors, managing, agents, employees, or other sufficiently knowledgeable persons to testify and provide all responsive documents concerning the following topics:

1.  Procura's efforts to collect, search for, identify, and/or retrieve documents in response to Prairie River's Discovery Requests or otherwise in connection with this matter;

2.  Procura's document and electronic data destruction and/or retention policies and procedures, if any, and the deposition of any computers, hard drives, and other electronic storage devices or facilities;

3.  Any and all actions taken to preserve documents pending litigation or otherwise, the date these actions began, and any variations from Procura's normal document retention and/or destruction practices, procedures or policies in connection with this matter;

4.  The history and status of Procura's Software sales in the U.S. including all versions of the Software that have been sold in the U.S. and identities of all past and present customers in the U.S. and the date of each sale;

5.  All disputes, formal or informal, Procura has had with customers in the U.S. regarding its Software;

6.  The identities of and circumstances surrounding any customers in the U.S. who have terminated or cancelled their license agreement with Procura;

7.  All representations made to Prairie River regarding the Software prior to the sale;

8.  All efforts made to address concerns and complaints raised by Prairie River regarding the Software after the License Agreement was signed;

9.  All sales Procura has made in the U.S. to home health care companies since selling the Software to Prairie River;

10. Procura's interpretation of all terms of the License Agreement;

11. A comparison of Procura's Software sales in the U.S. to its sales in other countries;

12.     Procura's financial performance, including its revenues and annual monthly profit and loss statements, for 2012 through 2017; [and]

13.     The corporate structure of Procura and Complia Health, including ownership, control, and/or financial relationships between those entities.

(Abbate-Dattilo Decl. Ex. A [Doc. No. 229-1 at 2–9].)

Notwithstanding follow-up inquiries by Prairie River's counsel, Procura did not respond to the notice until November 26, 2018, when it offered dates in January 2019 and contended the deposition should be held near its corporate headquarters in Schaumberg, Illinois. *See, e.g.*, (Abbate-Dattilo Decl. Ex. C [Doc. No. 229-1 at 15–19]; Ex. D [Doc. No. 229-1 at 22].) After meet and confer efforts failed to yield an agreement on when and where the depositions would occur, the dispute was submitted through the Court's IDR process. (Jan. 9, 2019, Minute Entry [Doc. No. 195].) At the IDR conference, only the location and timing of the noticed 30(b)(6) deposition was discussed; the minutes reflect no mention by Procura of objections or concerns about the deposition topics themselves, nor does the record reflect that such objections or concerns were raised in the parties' correspondence with each other prior to the IDR conference. After considering the parties' arguments, the Court agreed with Procura that Prairie River's 30(b)(6) deposition of Procura should be conducted in Schaumberg, in part because the location would provide the corporate representatives with more convenient access to the people and documents required to prepare for the requested topics. The Court further ordered that the deposition be completed on or before February 8, 2019. (*Id.*)

14

On January 14, 2019, Prairie River served a new 30(b)(6) notice that identified the identical topics as the October 2018 notice, but scheduled the depositions of the two previously identified Procura corporate designees (Chris Junker and John Walles[10]) for January 24 and 25, 2019, in Schaumberg, Illinois.  (Abbate-Dattilo Decl. Ex. G [Doc. No. 229-1 at 54, 57-59].)

On January 16, 2019, two and a half months after the October 2018 notice, Procura served first-time objections and responses to Prairie River's 30(b)(6) topics, and sought to limit the scope of several of them.  (Abbate-Dattilo Decl. Ex. J [Doc. No. 229-1 at 159–63].)  With respect to topic 4, which called for a witness to answer questions about the "history and status of Procura's Software sales in the U.S. including all versions of the Software that have been sold in the U.S. and identities of all past and present customers in the U.S.," Procura promised only that "Chris Junker will be prepared to discuss the history and status of Procura's licenses and projects with U.S. customers (former or current) who have experienced alleged functionality issues with the Procura Software similar to those alleged by Prairie River in this case." (*Id.* at 161.)  Similarly, for topic 5, which sought testimony about all disputes Procura had with U.S. customers about the subject software, Procura stated that Junker would only "be prepared to discuss formal and/or informal disputes that Procura has had with its U.S. customers (former or

---

[10] Chris Junker was president and CEO of Procura LLC at the time of the deposition. (Junker Dep. Tr. [Doc. No. 298-1 at 15:22–23].) John Walles was the "U.S. general manager" at the time of the deposition and was the Chief Financial Officer during the events at issue in the operative pleading.  (Walles Dep. Tr. [Doc. No. 298-2 at 17:1–7].) For ease of reference, all page references for depositions are to the page number on the transcript itself, not to the CM/ECF pagination.

current) regarding alleged functionality issues with the Procura Software similar to those alleged by Prairie River in this case, from 2009 - present." (*Id.*)

Topic 6 addressed customers who had terminated their licenses for the Procura software, and the circumstances of those terminations, to which Procura responded that Junker "will be prepared to discuss the identities and circumstances surrounding Procura's U.S. customers who have terminated or cancelled license agreements in connection with alleged functionality issues with the Procura Software similar to those alleged by Prairie River in the above-captioned case." (*Id.*)

Procura's response to topic 7 did not seem to impose any limitations: Procura stated Junker would be prepared to testify "regarding representations that Procura made to Prairie River regarding the Procura Software, including any features, functionalities, capabilities, enhancements, and/or go-live deadlines related to the Software, prior to the license of the Procura Software to Prairie River." (*Id.*) Procura did limit Junker's promised preparation on topic 9, however, to licenses and projects between Procura and a U.S. home health care company subsequent to the license to Prairie River "wherein the home health care company alleged functionality issues with the Procura Software similar to those alleged by Prairie River." (*Id.* at 162.)

Procura designated John Walles for topics 1, 2, 3, 8, 10, 12, and 13. (*Id.* at 160–163.) Among those, the only topic to which Procura objected was topic 12, as to which it objected to overbreadth and vagueness, and stated that Walles would only be "prepared to discuss Procura's 'quarterly and monthly financial statements for the calendar year 2015'

and Procura's 'third quarter [2015] sales goals,' including any modification related thereto."[11]  (*Id.* at 162.)

Finally, as to topic 11, Procura objected that sales of the Procura software outside the U.S. were irrelevant, and it designated no witness at all for that topic.  (*Id.*)

Prairie River contested both the timeliness and adequacy of Procura's objections and limitations, arguing that they came too late and that, in any event, Procura was required to move for a protective order if it wished to maintain its objections or limit the scope of the inquiry.  Neither party came to the Court with the dispute, however, and so the depositions proceeded in late January.

### b.    The Junker Deposition

Early in the deposition of Chris Junker, signs of trouble were on the horizon.  As Prairie River counsel went through the topics, using as a reference the document that contained Procura's responses and objections, Junker denied he was prepared to testify about several of the topics for which he had been designated, even within the limited scope as to which Procura's counsel had promised Junker would be prepared:

> Q. Do you understand that you have been designated as the corporate representative as to Topic 4?
> A. I do.
> Q. And are you prepared to testify today regarding that topic?
> A. Yes, I am.
> Q. All right. Same question as to 5.
> A. Yes. I understand that.
> Q. Okay. And you're prepared to testify to that topic?
> A. I am.

---

[11] This echoed a limitation the Court had previously crafted for a similar request for production of documents as to which Prairie River had moved to compel production.  *See* (Jan. 9, 2019, Order at 2.)

Q. How about 6?
A. I do not know or have a total — I don't know if this is something
specific that you would want me to address relative to customers
terminated. I'm happy to take a look at that, but I couldn't name all or
identify all.
Q. Well, let's set that aside. We'll get into the subject matter of each of
these. How about No. 7?
A. No. I couldn't — I'm not prepared to answer that. I was not involved in
the sales process. The majority of that was done by Salo.
Q. Okay. How about Topic 9?
A. I would again not know all. I would be happy to respond to anything that
you could show me that you need me to answer to.

(Junker Dep. Tr. at 13:18–14:19.)

Even greater cause for concern arose when Prairie River counsel inquired about

how Junker had prepared for the deposition.  When asked what he had done to prepare to

testify as to topic 4, Junker responded "Nothing."  (*Id.* at 67:14–16.) When asked what he

had done "to prepare for your deposition generally today," Junker responded that on his

own, he had "looked at the agreement that was signed between Procura and Prairie

River," and that he "also kind of glanced through the one with Salo" but that was

"[p]retty much . . . it" other than a short conversation with Walles about a single email.

(*Id.* at 67:17–69:16.)  In addition, he had one meeting with Walles and Procura counsel

which took place two days before the deposition and lasted about an hour and a half, and

a 15 to 20-minute telephone call with the same individuals the day before the deposition.

(*Id.* at 69:17–71:7.)  He met with no one else in person or by phone to prepare for the

deposition.  As for reviewing documents to prepare to testify about the topics for which

he was designated, he recalled only that "we may have looked at the complaint." (*Id.* at

71:14–21.)

18

As the discussion moved into the substance of topic 4, the first of the topics on which Junker was designated to testify, Junker testified he did not know what version of the software Procura was on when he joined the company in 2015, what version it was on at the time of his deposition, or how many versions or updates it had been through in the intervening years. (*Id.* at 73:11–22.) He did not know how many U.S. customers Procura had when he joined the company, or what approximate percentage of its total customers or total revenues at that time were in the U.S. (*Id.* at 73:23–74:20.) He could not identify Procura's largest customers in the U.S. at the time he joined the company in 2015 (*Id.* at 74:21–25), and although, in his role as president and CEO of Procura, he had met with several U.S. customers, he could not name a single one of them. (*Id.* at 75:6–19.) Junker was unable to name any "large" U.S. customers of Procura other than Salo, and was unable to name any "mid-sized customers" other than PASCO. (*Id.* at 82:9–83:7.) Furthermore, he could not identify any other Procura customers that were similar in size to PASCO or Prairie River. (*Id.* at 83:8–23.)

As for Procura's software sales in the U.S. after the Prairie River sale, Junker did not know how many U.S. customers had bought the Procura software since he joined the company, although he thought it was less than five, and he could not name any of those customers other than Prairie River. (*Id.* at 76:21–77:16.) He did not know how many of them remained customers of the company, nor could he testify to how many U.S. customers had left Procura for any reason since he had become president and CEO. (*Id.* at 77:25–78:23.) He could not answer whether the software sale to Prairie River was the last such sale in the U.S., although he did testify that Procura is "not really promoting

[the software] in the US [anymore]" because other software offerings are now Procura's "go-to-market platform."  (*Id.* at 84:3–20.)

Furthermore, even though Procura had agreed that Junker would at least be able to testify about "the history and status of Procura's licenses and projects with U.S. customers (former or current) who have experienced alleged functionality issues with the Procura Software similar to those alleged by Prairie River in this case," Junker could not answer how many customers had left for the same reasons Prairie River left, and he did not even know what categories the company used to track why customers chose to leave, although he testified that "we do track that. You should be able to get that."  (*Id.* at 79:3–12.)  He had no other information responsive to topic 4.  (*Id.* at 96:16–20.)

Moving on to topic 5, as to which Procura had promised Junker would be "prepared to discuss formal and/or informal disputes that Procura has had with its U.S. customers (former or current) regarding alleged functionality issues with the Procura Software similar to those alleged by Prairie River in this case, from 2009 – present," Junker stated he did nothing "to prepare for this topic in particular."  (*Id.* at 97:10–13.) He testified, however, that in addition to Prairie River, he was "aware of At Home having a level of dissatisfaction," and that he was "aware of Small Hands" but not "intimately" so.  (*Id.* at 97:18–21.)  As to the latter, he testified that he "couldn't tell you what their issue was," and did not know what specific functionalities were at issue.  (*Id.* at 97:22–98:21.)  He had a "recollection" that the system was a "mismatch" and that Procura discussed and ultimately decided to "let them out of their agreement," although he did not know what Procura did to investigate the issues raised by Small Hands and he did not

20

remember how the dispute was ultimately resolved. (*Id.* at 97:22–98:21, 99:14–24.) "I

don't recall that there was specific technical issues. I don't recall. There may have

been." (*Id.* at 113:25–114:3.)

Junker testified he was not aware of any other customers responsive to topic 5 (*id.*

at 98:2–4), even though supplemental interrogatory responses from Procura a month

earlier had identified two others, PASCO[12] and Interim Healthcare (Abbate-Dattilo Decl.

Ex. H [Doc. No. 229-1 at 92–103]). In addition, Prairie River asserts that analysis of

Procura's more recent document productions reveals still more customers who have

complained of functionality issues with the Procura software, including the billing

function, several of whom ultimately terminated their relationship with Procura because

of those issues. *See* (Prairie River's Mem. in Supp. of First Mot. for Sanctions at 15 and

exhibits cited therein.) When asked how he went about identifying the three customers

(counting Prairie River) that he did name in response to counsel's questions, it was clear

from Junker's response that his testimony was based entirely on what he was personally

aware of and happened to remember, not on any attempt to gather information known to

others in the company or that might be available in company records. *See, e.g.,* (Junker

Dep. Tr. at 98:24–99:13 ("I'm not sure how my recollection was, you know, it was – I'm

not sure why I remember Small Hands."))

---

[12] When Prairie River's counsel mentioned PASCO, Junker "couldn't answer" who or
what was responsible for the problems PASCO had with the Procura software. (Junker
Dep. Tr. at 114:15–18.)

It was similarly clear in Junker's testimony about the specifics of the issues complained of by At Home that he was relying entirely on his personal recollection of his own limited direct involvement with the customer. *See generally* (*id.* at 100:4–111:2.) He recalled meeting with At Home, but could only remember one functionality issue of which that customer complained, which related to secondary billing. "I can't say that that was their only issue. It's the only issue that I recall." (*Id.* at 103:18–19.) He did not remember what the At Home representatives told him about the impact of the issues on At Home's business, nor did he remember what was done to address the issues that were raised. "The general impression I have—it's a long time ago—they were dissatisfied." (*Id.* at 104:11–12.) "I just remember that they were having difficulties." (*Id.* at 105:7–8.)

The tenor of the testimony with regard to Junker's preparation, or lack thereof, was similar when the deposition moved on to topic 6, relating to the circumstances surrounding U.S. customers who had terminated or cancelled their license agreements with Procura. Junker testified he did nothing to prepare for that topic and "just was aware of At Home and Prairie River and Small Hands." (*Id.* at 119:8–16.)

As for topic 7, Junker claimed he was not aware of any representations made in connection with selling the Procura software to Prairie River because "[w]e did not do the selling. The selling was done by Salo. Salo may have made representations that we're not party to." (*Id.* at 124:14–16.) But he did nothing to prepare for the topic other than consult his own "general recollection of the process that took place," *see* (*id.* at 124:13–125:7), and ask Scott Overhill, in a brief conversation about another subject, if Procura had ever done any "demos." (*Id.* at 125:17–126:4.) And although Overhill told him

Procura had participated in a demo with Prairie River, Junker did not know (and apparently did not bother to ask) which demo it was, what it pertained to, or whether it involved billing, because Junker "wasn't involved in any of the product aspects of the deal." (*Id.* at 126:5–19.)  Indeed, Junker did not know, and had not asked anyone in preparation for his deposition, whether it was Salo or Procura that had set up or demonstrated the billing functionalities of the software Prairie River purchased.  (*Id.* at 127:2–128:1, 128:23–129:2.)

### c.      The Walles Deposition

John Walles was also asked about his preparation for the topics on which he was designated.  He testified that he was prepared to testify regarding topics 1, 2, 3, 10, and 13, but that he was not prepared to discuss topics 11 or 12.  (Walles Dep. Tr. at 15:6–16:22.)  In response to questions about his preparation, he testified that his own participation in the preparation meeting with Junker and counsel lasted "two and a half to three hours." (*Id.* at 13:14–15.)  He also participated in a conference call with Junker and counsel that he estimated lasted about 45 minutes.  (*Id.* at 14:23–15:2.)  As for documents, he recalled reviewing documents provided to him by counsel, including the deposition notice and Procura's responses and objections thereto, and some of the "other suit filings." (*Id.* at 14:1–20.)  He testified that he did not talk to any other employees of the company and did nothing else to prepare for his deposition.  (*Id.* at 13:19–25, 15:3–5.)

Turning to the substance of topic 1, which pertained to Procura's efforts to gather documents in response to discovery (a topic to which Procura did not object and the

scope of which it did not limit), Walles stated that he did not do anything to prepare specifically for this topic. (*Id.* at 47:8–11.) He testified that he personally sent an email to all the individuals that were currently employed and had been involved with the Prairie River matter. He described the email as saying "please go back through your emails and identify anything related to the Prairie River situation," and Walles expected that "people would be responsible." (*Id.* at 48:6–10, 58:21–25.) Once Walles had sent that email, Procura's general counsel Kirk Isaacson "handled the capturing of all of the information that was forwarded back from each individual." (*Id.* at 48:11–13.) But although Isaacson attended the deposition preparation meeting and subsequent phone call, it appears he did not provide Walles with any additional details about what the company had done to meet its discovery obligations. (*Id.* at 53:20–23.) Walles did not know, for example, whether any effort was made to copy or collect or get access to individual employees' entire email accounts so that Isaacson or a vendor could run their own searches (as opposed to simply having each employee search his or her own emails). (*Id.* at 51:11–17 ("I don't know. As I told you, I forwarded that information and [Isaacson] took it from there."); *see also id.* at 51:19–52:12 ("[T]he legal end of the organization took care of that.").) The same was true for the collection of non-email documents responsive to discovery. (*Id.* at 53:24–54:21 ("Q. Are you aware of any other specific efforts that Mr. Isaacson took. A. That was his responsibility.").) He also did not know— and had not asked—what efforts had been made to search the corporate database used by some of the individuals involved with the Prairie River project. (*Id.* at 56:21–57:14.) He did not know what steps had been taken to search for emails or other documents of

24

individuals who had left the company.  (*Id.* at 60:4–8.)  In short, other than that: (1) he sent an email to current employees who had been involved with Prairie River instructing them to search for "anything related to the Prairie River situation"; (2) he delegated responsibility for compliance to his general counsel; and (3) he expected employees to "be responsible," Walles could provide no other information about Procura's efforts to gather documents in response to discovery.  (*Id.* at 57:19–23.)

As for topic 2, the company's document retention and disposition policies, Walles also stated he had done nothing specific to prepare for the deposition. (*Id.* at 47:8–11.) He did testify that the company has no email retention policy, *see* (*id.* at 47:15–16), and has no document destruction policy, *see* (*id.* at 61:17–18), but he did not know whether there was an automatic delete function in operation on any of the individual users' computers, although he did not have such a function on his own.  (*Id.* at 50:20–51:10.)

Topic 3 addressed what efforts had been made to preserve documents that might be relevant to the instant litigation.  Walles testified that a request was sent to specific individuals who had been involved in the Prairie River matter instructing them clearly not to destroy anything at all.  (*Id.* at 57:24–58:25.)  He did not, however, have a list of the individuals to whom the request was sent.  (*Id.* at 59:1–3.)  He also did not know the date the request was sent, although he knew it was after the lawsuit was filed.  (*Id.* at 62:19–23.)  He did not know if anything was done to preserve documents after the company was on notice of a potential legal claim but before the lawsuit was filed. (*Id.* at 62:19–64:14.) Furthermore, he could not speak to whether any steps were taken to preserve emails and

documents of individuals who had been involved with the Prairie River project but who had left the company. (*Id.* at 59:10–61:15.)

As to topic 8, concerning the efforts made to address Prairie River's complaints after the license agreement was signed, Walles testified that he did no preparation on this topic beyond the meetings with counsel and Junker already discussed. (*Id.* at 126:5–16.) In particular, it was clear from his testimony that the scope of his knowledge on this topic, like Junker's, was based on what he himself became aware of in the course and scope of his employment, and not on any inquiry of others who were involved. Thus, if Walles was not personally aware of particular complaints or particular actions taken to address those complaints at the time they were unfolding, he was not able to testify about the company's knowledge on those matters. *See, e.g.,* (*id.* at 126:21–127:23, 130:10–17.) Furthermore, although he first became aware of Prairie River's difficulties with the software by an email received on November 14, 2016, he could not testify about what specific solutions Procura offered Prairie River between November 14, 2016, and February 2017, when he visited Prairie River's offices in Minnesota. (*Id.* at 133:1–19 (stating that there are "a number of other individuals that would be much more appropriate to respond to that"); 140:23–141:19 (did not look at open tickets and does not have information about "specifically what was discussed or suggested or provided or offered" prior to his trip to Prairie River in February 2017).) And, he could not testify to the specifics of what was done to address Prairie River's concerns *after* the February 2017 meeting. (*Id.* at 149:20–151:5 (testifying that "there were people involved" and

26

"some actions were taken" but he was not the "primary person who would be driving those actions" and does not know what they were).)

On topic 10, Prairie River sought testimony from Walles about Procura's interpretation of certain contract terms in the Prairie River agreement that are at issue in the litigation. There were two principal areas of inquiry. One involved the definition of the term "documentation" as used in the agreement. Since the agreement provides that the software will work in accordance with the "documentation," the identification of all documents that comprise the "documentation" was a focus of Prairie River's written discovery[13] as well as its 30(b)(6) deposition questioning. Walles was not able to provide a definitive answer. He testified that the documentation for any particular sale "depend[ed] on the sales process," and he "was not at that sales process to say what specifically was committed to beyond just the stated items that are available . . . . So I don't know what was committed to or the expectations." (*Id.* at 81:12–82:6.) When shown Procura's response to Prairie River's Interrogatory No. 10, which asked for identification of the documentation, Walles testified that he had not been involved in preparing the answer to that interrogatory or identifying the documents. (*Id.* at 83:15–85:8.) He testified that the documentation could vary with each transaction, (*id.* at 86:2–4), and he was "not aware of what that unique elements of the sales process for this particular transaction were and what could have possibly been provided that isn't in [the

---

[13] *See* (Nov. 28 Order at 3.)

documents identified in response to Interrogatory No. 10] right now." (*Id.* at 88:12–15.) He made no other investigation or inquiry beyond that.

The other area of inquiry concerning the interpretation of the contract had to do with Procura's interpretation of the warranty provisions. In that area, Walles responded to most of counsel's questions, although there were some to which he demurred on the ground that they called for a legal opinion. *See generally* (*id.* at 92:22–109:21.)

With respect to topic 12, Walles stated that there was financial information that they were "pulling together to respond in detail" relating to fiscal years 2015 and 2016, but that he did not "have that documentation right in front of me" and could not speak in detail to that financial information from memory. (*Id.* at 117:10–14.) He was not able to identify Procura's third quarter sales goal for 2015, (*id.* at 117:16–19), or whether the company met that goal, (*id.* at 121:24–122:1). He was, however, able to provide an estimate of annual revenues for 2014, 2015, 2016, 2017, and 2018. (*Id.* at 118:10–120:15.) Counsel asked no other significant questions regarding topic 12.

Finally, Walles was designated on topic 13, defined by Prairie River (and not objected to by Procura) as "the corporate structure of Procura and Complia Health, including ownership, control, and/or financial relationships between those entities."[14] He stated that he did not do anything to prepare for that topic. (*Id.* at 17:18–19). He testified, however, about the corporate form of Defendant Procura LLC, and the fact that

---

[14] In the "Definitions and Instructions" included with the 30(b)(6) notice, "'Procura, LLC, a/k/a Complia Health' means Procura." *See, e.g.*, (Abbate-Dattilo Decl. Ex. G [Doc. No. 229-1 at 56].)

28

Complia Health is a "d/b/a" (doing business as) for Procura LLC rather than a separate corporate entity.  (*Id.* at 23:1–18.)  He testified that Procura USA Holdings, Inc., owns Procura LLC, and that Procura Holdings USA Holdings, Inc., is in turn owned by Procura Holdings, Inc., which was acquired by Carrick Capital Management in 2014.  (Walles Dep. Tr. at 19:6–11.)  He responded to questions about the nature of the acquisition of Procura Holdings by Carrick.  (*Id.*)  He testified about the other companies owned by Procura Holdings, Inc., and the other companies owned by Procura Holdings USA, Inc. *See, e.g.*, (*id.* at 18:23–19:4.)  He did not recall the state in which Procura LLC is incorporated, *see* (*id.* at 17:20–22), and was not certain of the identities of the members of Procura LLC, although he knew that Procura LLC is "structured and owned by Carrick Capital Management or elements of that."  (*Id.* at 31:2–6.)  He testified about other companies whose assets had been acquired by Procura LLC, and about which entities owned intellectual property for the various software products of the affiliated companies. *See, e.g.*, (*id.* at 21:8–22:25, 65:6–17.)  He testified generally about the fact that there was cross-selling of products within the organization, although it appears he was not familiar with the specific details of those agreements.  (*Id.* at 66:8–19.)

Walles was also asked about the flow of employees among the various corporate entities and which individuals were employed by which of those entities.  He was able to answer some of those questions, but not all of them.  For example, he was able to name the individuals who worked at the corporate headquarters in Schaumberg, Illinois, but was not certain whether all of them were employees of Procura LLC or whether some were employed by one of the other entities.  (*Id.* at 29:20–30:21.)

C.    **Discovery Disputes Between Procura and Salo**[15]

On September 17, 2018, Procura filed a third-party complaint against Salo, alleging that Salo—as the implementation service provider—mishandled the software rollout, that Salo's conduct was the actual cause of Prairie River's damages, and that Salo is contractually obligated to indemnify Procura. *See* (Third-Party Compl. [Doc. No. 69] ¶¶ 14, 18, 28–29, 31–48.)

After Salo was brought into the case, the pretrial schedule was amended by stipulation of the parties. *See* (Dec. 6, 2018, Order on Third Stipulation to Amend Scheduling Order [Doc. No. 184].)   Relevant to this discussion, the order provided that document production was to be substantially completed by February 28, 2019, and fact discovery was to be completed on or before March 31, 2019. (*Id.* at 2.) Salo was to serve its initial disclosures by November 21, 2018, and to produce any documents identified in those disclosures by December 30. (*Id.*)

In its written initial disclosures, Salo stated that the documents in its possession that it "may rely upon to support its claims or defenses" would be found in its "project file." *See, e.g.*, (Salo's Mem. in Opp'n to Procura's Mot. to Amend at 9; Hr'g Tr. at 106.) Procura seems to contest whether these initial disclosures were complete and also asserts Salo should have supplemented them as discovery proceeded. *See, e.g.*, (Procura's Mem. in Opp'n to Salo's Mot. for Sanctions [Doc. No. 260 at 27–28].) Salo

---

[15] While Judge Tunheim's order granted Salo's motion to dismiss, thereby mooting a significant portion of Salo's motion for sanctions, some of the discovery disputes between Salo and Procura are nevertheless relevant to other motions before the Court.

states that it timely produced the "project file" by December 30.  *See, e.g.*, (Salo's Mem. in Opp'n to Procura's Mot. to Amend at 9; Hr'g Tr. at 106.)[16]

Sometime in November, Salo and Procura began discussing a search methodology for Salo's electronically-stored information.  In mid-November, Salo told Procura that if they could not reach agreement on search terms soon, Salo would have trouble meeting the February 28, 2019, deadline for substantial completion of document production (Thompson Decl. Ex. 67 [Doc. No. 243-4 at 59].)  The parties were not able to reach agreement on search terms until December 20.  *See, e.g.*, (Thompson Decl. Exs. 66-70 [Doc. No. 243-4 at 56–76]; Exs. 71-79 [Doc. No. 243-5 at 1–44].)

Somewhat oddly, this discussion of search terms took place before Procura served any requests for production of documents.  Indeed, Procura did not serve discovery requests of any kind on Salo until January 14, 2019, a little over two months after the Court entered the amended scheduling order.  (Thompson Decl. Ex. 34 [Doc. No. 243-3 at 1–9].)  On January 22, citing the volume of documents retrieved by the search terms to which the parties had agreed, Salo "ask[ed] for the same three weeks[] extension that

---

[16] The order did not set a deadline for Procura to serve initial disclosures relating to its third-party claims against Salo, but the parties separately agreed that Procura would do so by December 7, 2018.  (Thompson Decl. Ex. 80 [Doc. No. 243-5 at 45].)  Procura did not, however, serve its initial disclosures upon Salo until February 1, 2019, nearly two months after the deadline agreed to by the parties.  (Thompson Decl. Ex. 81 [Doc. No. 243-5 at 55–58].)  In addition, citing Rule 5 of the Federal Rules of Civil Procedure, Salo requested that Procura produce to Salo the discovery that Procura had previously produced to Prairie River.  *See* (Thompson Decl. Ex. 41 [Doc. No. 243-3 at 30].)  It appears that Procura did not do so until November 20, 2018, nearly four weeks after Salo's request, and then only after Salo threatened motion practice.  (Salo's Mem. in Supp. at 17; *see also* Thompson Decl. Exs. 42–43 [Doc. No. 243-3 at 32, 39]; Thompson Decl. Ex. 66 [Doc. No. 243-3 at 56].)

[Salo had] provided to Procura,[17] such that the responses to the interrogatories and requests will be due on March 6, 2019. Please let us know whether Procura will extend this time for our responses." (Thompson Decl. Ex. 35 [Doc. No. 243-3 at 10.) Procura lead counsel Hillard Sterling responded, "Agreed. Let's discuss the timing of the document production while we're together at depositions this week." (*Id.*) It is unclear from the record what, if anything was discussed at the depositions, but the email exchanges leave no doubt that Salo was operating on the understanding that its deadline for producing written responses and documents in response to Procura's discovery requests was March 6, per the agreed extension. *See, e.g.*, (Thompson Decl. Ex. 3 [Doc. No. 243-1 at 10–11].) However, Salo made initial productions on February 13 and 19, supplemented those productions on February 28, and served its written responses to Procura's interrogatories and requests for production on March 2. *See e.g.*, (Sterling Decl. Exs. A-B [Doc No 282-1].)

## 1.    Salo's Rule 30(b)(6) Notice to Procura and Procura's Failure to Appear

On January 3, 2019, Salo served a Rule 30(b)(6) notice of deposition on Procura, setting the deposition for February 5, 2019. (Thompson Decl. Ex. 1 [Doc. No. 243-1 at 1–7].) On January 31, prompted by an email from Salo asking for the identity of Procura's corporate designee, Procura counsel Brittany Bermudez called Salo's counsel to say that the noticed deposition had "'fallen through the cracks and was not on their calendar,'"

---

[17] This refers to "an extension that Salo had provided to Procura" concerning Salo's discovery requests that were served on Procura in December 2018. *See* (Salo's Mem. in Supp. at 12–13.)

and that as a result, they would not have a deponent prepared for the deposition. (Thompson Decl. [Doc. No. 243 ¶ 5]; Thompson Decl. Ex 2 [Doc. No. 243-1 at 8].)

But a subsequent email from Procura attributed the need to postpone the Rule 30(b)(6) deposition to the fact that Procura had not yet received Salo's documents and therefore could not adequately prepare its own corporate designees. (Thompson Decl. Ex. 3 [Doc. No. 243-1 at 11].) Therefore, Procura stated, the Rule 30(b)(6) deposition should be postponed to "at least three weeks after we receive Salo's document production." (*Id.*) Shortly thereafter, Procura sent another e-mail asking Salo to confirm that it was planning "on producing all documents by 2/13, which was the initial deadline." (*Id.* at 10.) Surprised, Salo responded with its understanding that "the document production is not due until March 6." (*Id.*). But, Salo stated, it would be willing to postpone the Rule 30(b)(6) deposition provided that a new date could be agreed upon, the deposition would be conducted in Minneapolis, Procura would make no objections to any of the topics, and Procura confirmed the parties' agreement that Salo's responses and documents were not due until March 6. (Thompson Decl. Ex. 3 [Doc. No. 243-1 at 9].). When Procura did not immediately respond, Salo sent a further email on February 1, 2019, noting that it was continuing to prepare for the 30(b)(6) deposition of Procura on February 5 as noticed and "[i]f the witness does not appear or [you] lodge[] any objections, we will seek to recover all fees and costs incurred preparing for the deposition, in addition to all other appropriate relief." (Thompson Decl. Ex. 4 [Doc. No. 243-1 at 22].) Procura replied that the "deposition was never scheduled, and . . . we have not yet designated testifying witnesses," and insisted it should have "the opportunity to

33

designate our witnesses and schedule the deposition(s) at mutually agreeable and available date(s) and time(s)."  (Thompson Decl. Ex. 5 [Doc. No. 243-1 at 23].)   Salo reminded Procura that it had noticed the deposition for a date certain more than thirty days ahead and that Procura had not raised any issues about the date or anything else until January 31.  Nevertheless, Salo canceled the court reporter and videographer, and announced its intention to "proceed with a meet and confer discussion and motion practice." (Thompson Decl. Ex. 6 [Doc. No. 243-1 at 25].)

### 2.   Procura's Cancelation of the Private Mediation

Pursuant to the parties' stipulation, the amended pretrial scheduling order provided that the parties would engage in a private mediation on or before February 28, 2019. (Dec. 6, 2018, Order on Third Stipulation to Amend Scheduling Order at 3.)  On December 17, 2018, the parties scheduled a mediation for February 26, 2019, with retired United States Magistrate Judge Arthur J. Boylan.  (Thompson Decl. Ex. 53 [Doc. No. 243-4 at 19].)

On the morning of February 19, 2019, Procura emailed Salo about the document production Procura thought it should already have received from Salo, and for the first time raised its desire to postpone the mediation on the ground that it could not adequately prepare for the mediation without Salo's documents.  (Thompson Decl. Ex. 55 [Doc. No. 243-4 at 28–29].)  Ten minutes after sending that email—and before Salo could respond—Procura contacted Judge Boylan's scheduler, told her the mediation would need to be rescheduled, and inquired about dates in March.  (Thompson Decl. Ex. 60 [Doc. No. 243-4 at 37].)  The scheduler informed Procura that Judge Boylan's next

available dates were in June.  (*Id.*)  A few hours later, Salo responded to Procura's email and stated that the mediation could not be rescheduled in view of the mediation deadline set by the pretrial scheduling order.  (Thompson Decl. Ex. 55 [Doc. No. 243-4 at 28].)

On February 22, Procura again raised the issue of postponing the mediation. (Thompson Decl. Ex. 56 [Doc. No. 243-4 at 30].)  Both Prairie River and Salo responded that rescheduling was not an option.  (Thompson Decl. Exs. 56–57 [Doc. No. 243-4 at 30–31].)  On February 23, Judge Boylan emailed the parties to seek clarification about the status of the mediation—the first time Prairie River or Salo heard that Procura counsel had already approached Judge Boylan about moving the February 26 mediation. (Thompson Decl. Ex. 58 [Doc. No. 243-4 at 33]; Ex. 60 [Doc. No. 243-4 at 36–37].) Salo sent several emails over the course of February 23, requesting confirmation about Procura's intentions with regard to the February 26 mediation so that Salo business representatives could cancel their flights if necessary.  (Thompson Decl. Exs. 64–65 [Doc. No. 243-4 at 46, 49–51].)  But Procura did not respond until February 25, by which time Salo's business representatives were already en route (although they were ultimately called off before their planes departed).  *See* (Thompson Decl. Ex. 65 [Doc. No. 243-4 at 49–55]; *see also* Salo's Mem. in Supp. at 29 (stating that one of Salo's representatives received notice about the cancelation while on the way to the airport and another was able to deplane before the flight departed).)

3.     **Procura's Disputes with Salo about the Sufficiency of Salo's Discovery Responses and the Scheduling of Salo and Prairie River Witness Depositions**

Procura's dissatisfaction with the timing of Salo's discovery responses has been discussed above, but Procura was also dissatisfied with the sufficiency of those responses, and alleges that because they were insufficient, it was unable to schedule depositions of Salo witnesses before the fact discovery deadline set by the amended scheduling order.  *See* (Procura's Mem. in Supp. of Mot. to Amend [Doc. No. 281]; Sterling Decl. Exs. A-B [Doc. No. 282-1 at 2–49]; Procura's Suppl. Mem. in Supp. of Mot. to Amend [Doc. No. 324 at 3–5].)  Procura alleges Salo impermissibly relied on boilerplate objections, intentionally omitted responsive information, and generally did not comport with the discovery rules.  Procura now requests that fact discovery be extended "to permit Procura to depose key Salo witnesses after Salo has certified its discovery responses to be complete."  *See* (Procura's Suppl. Mem. in Supp. of Mot. to Amend at 5.)

The topic of scheduling depositions of Salo's witnesses first appears in emails in November 2018, when Salo suggested it could make its witnesses available on December 19 and 20, 2018.  *See* (Thompson Decl. Ex. 5 [Doc. No. 333-2 at 31].)  Procura never agreed to those dates.  (Thompson Decl. Ex. 11 [Doc. No. 315-2 at 26].)  In mid-December, Salo offered new dates of January 17 and 18, 2019.  (*Id.* at 25.)  Procura responded that those dates did not work, but proposed as an alternative January 29 and 30. (*Id.*)  But in subsequent emails on January 15 and 16—a day or two after it first served discovery requests on Salo—Procura stated (apparently for the first time) that it did not want to take the Salo depositions at all until after it had received Salo's document

production.  (Thompson Decl. Ex. 13 [Doc. No. 315-2 at 29, 31].)  Prairie River, which was, not surprisingly, also interested in the Salo depositions, agreed somewhat reluctantly that the depositions could be postponed until February and suggested the weeks of February 11 or 18, 2019.  (*Id.* at 29.)  Procura did not respond to those dates.  (Thompson Decl. [Doc. No. 333 ¶ 10]; *see also* Thompson Decl. [Doc. No. 315 ¶ 27].)

On January 28, 2019, Salo proposed March 11 and 12 as deposition dates for certain Salo witnesses.  (Thompson Decl. Ex. 14 [Doc. No. 315-2 at 34].)  But "Procura never followed up on those dates or inquired further until February 26."  (Thompson Decl. [Doc. No.  315 ¶ 28] (citing Thompson Decl. Ex. 31 [Doc. No. 243-2 at 98]).)  On February 27, 2019, Procura noticed seventeen depositions of Salo and Prairie River witnesses.[18]  *See* (Abbate-Dattilo Decl. Ex. T [Doc. No. 274-2 at 47–48].)  Prairie River objected, stating it did not believe "[t]here is . . . adequate time for [Procura] to take 17 depositions." in the time remaining before the March 31, 2019, deadline for the close of fact discovery.  (*Id.* at 50.)

On March 4, 2019, Procura apparently narrowed the depositions it sought from Salo and Prairie River to two to three identified individuals per party.  *See* (Thompson Decl. Ex. 30 [Doc. No. 243-2 at 96]; Abbate-Dattilo Decl. [Doc. No. 274 ¶ 23].)  Salo responded the same day that the identified individuals had limited availability: some could be deposed March 18-22 and 25-29, while others were only available in April, after

---

[18] The record before the Court does not include the actual notices served by Procura, but from other correspondence provided to the Court, it appears the depositions were noticed for the week of March 18, 2019.  (Thompson Decl. Ex. 28 [Doc. No. 243-2 at 88]; Abbate-Dattilo Decl. Ex. T [Doc. No. 274-2 at 50].)

the close of discovery.  *See* (Thompson Decl. Ex. 30 [Doc. No. 243-2 at 96].)  Salo stated

its objections to moving the fact discovery deadline to allow Procura to take the

depositions out of time.  (*Id.*)

## II.        PRAIRIE RIVER'S MOTION FOR DISCOVERY SANCTIONS

### A.        Failure to Produce Properly Prepared 30(b)(6) Deposition Witnesses

Under Federal Rule of Civil Procedure 30(b)(6), a party may, in its notice of

deposition, "name as the deponent a public or private corporation . . . or other entity and

must describe with reasonable particularity the matters for examination."  The named

entity must then designate individuals "who consent to testify on its behalf; and it may set

out the matters on which each person designated will testify." Fed. R. Civ. P. 30(b)(6).

"The persons designated must testify about information known or reasonably available to

the organization." *Id.*  A requesting party must specify "the particular subject areas that

are intended to be questioned, and that are relevant to the issues in dispute."  *Prokosch v.

Catalina Lighting, Inc.,* 193 F.R.D. 633, 638 (D. Minn. 2000) (Erickson, Mag. J.).

"Correlatively, the responding party must make a conscientious good-faith endeavor to

designate the persons having knowledge of the matters sought by [the requesting party]

and to prepare those persons in order that they can answer fully, completely, unevasively,

the questions posed . . . as to the relevant subject matters." *Id.* (internal quotation marks

omitted).

A responding party must produce the number of persons that will satisfy the

request and must "prepare them so that they may give complete, knowledgeable, and

binding answers." *Id.* (internal quotation marks omitted); *see also United States v. Taylor*,

166 F.R.D. 356, 361 (M.D.N.C. 1996) ("If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation."). "If need be, the responding party must prepare deponents by having them review prior fact witness deposition testimony as well as documents and deposition exhibits." *Prokosch,* 193 F.R.D. at 638–39 (internal quotation marks omitted).

That said, the courts recognize that "[a]s a practical matter . . . the Rule 30(b)(6) deponent is not expected to be clairvoyant, so as to divine the specific questions that could [be presented]." *Arctic Cat, Inc. v. Injection Research Specialists, Inc.*, 210 F.R.D. 680, 686 (D. Minn. 2002) (Erickson, Mag. J.). Nevertheless, "the burden upon the responding party, to prepare a knowledgeable Rule 30(b)(6) witness, may be an onerous one, but we are not aware of any less onerous means of assuring that the position of a corporation, that is involved in litigation, can be fully and fairly explored." *Prokosch,* 193 F.R.D. at 639.

By their own admission, Procura's witnesses were not prepared to address the full scope of all of the topics in Prairie River's 30(b)(6) notice for which they were designated, or even the full extent of the more limited scope for which, two and a half months after the notice was served, Procura unilaterally designated them. This lack of preparation was apparent not only in their responses to the introductory questions described in the Background section above, but also in their responses to questions going to the actual content of the topics.

39

Federal Rule of Civil Procedure 37(d)(1)(a)(i) provides that the court may order sanctions if a person designated to testify under Rule 30(b)(6) fails to appear for the deposition.   While Procura points out that it produced witnesses,[19] courts in this District and elsewhere have held that "[p]roducing an unprepared witness is tantamount to a failure to appear, which is sanctionable under Fed. R. Civ. P. 37." *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, No. 09-cv-1091 (JNE/JSM), 2013 WL 12142579, at *4 (D. Minn. Mar. 20, 2013) (Mayeron, Mag. J.) (internal quotation marks omitted); *see also Con't Cas. Co. v. Compass Bank*, No. CA04–766, 2006 WL 533510, at *17 (S.D. Ala. Mar. 3, 2006) (stating that it is "the consensus of most federal courts to have considered the issue that a failure to appear at a deposition sanctionable under Rule 37(d)(1) includes those circumstances in which a 30(b)(6) corporate designee appears at deposition unprepared to testify," and citing cases); 8A Wright & Miller, *Federal Practice & Procedure* § 2103 n.13 (3d ed. 2019) ("Although absolute perfection is not required, producing an unprepared witness is tantamount to a failure to appear.").

Procura's argument that deponents' lack of preparation can be excused because Plaintiff's topics were overly broad also misses the mark.   *See* (Procura's Mem. in Opp'n Prairie River's First Mot. for Sanctions at 3–8.)   Rule 37(d)(2) clearly precludes reliance on the objectionable nature of the discovery sought as a defense against a motion for sanctions if there was no pending motion for a protective order under Rule 26(c).[20]

---

[19] Except as to topic 11, for which Procura did not designate any witness at all.

[20] Procura's reliance on existing caselaw, including *Arctic Cat*, for the proposition that sanctions cannot be imposed when the deposition notice was overly broad, *see* (Procura's Mem. in Opp'n Prairie River's First Mot. for Sanctions at 30–37), is misplaced.   For

While Procura may well be correct that several of the deposition topics were overly broad, it waited 2½ months even to voice those objections, and even then failed to bring a motion for protective order under Rule 26(c). Under these circumstances, Procura's objections did not excuse it from the obligation to make reasonable efforts to prepare for the topics *as originally noticed*.

Furthermore, even if Procura's objections had been sufficient to excuse Procura's failure to have Junker and Walles prepared for the full scope of the identified topics, Junker and Walles were unable even to answer questions that were clearly within the more limited scope of most of the topics for which Procura promised they would be prepared. For example, Procura promised Junker would be prepared to testify about Topics 4, 5, 6, and 9, at least with regard to customers who had had similar functionality issues or complaints to those categorized by Prairie River, yet Junker made no effort whatsoever to investigate what information *Procura* had about those topics beyond the incomplete and largely superficial understanding that he had developed in the course and scope of his regular responsibilities with the company. Similarly, on topic 7, Junker did not investigate what information was available within Procura regarding its role in the sale of the software to Prairie River and what representations Procura employees and representatives had made about its capabilities and functionality.

---

instance, *Arctic Cat* considered the breadth of the deposition topics when determining what sanctions would be appropriate, but not as a *per se* bar to their imposition. *See* 210 F.R.D. at 687 (imposing a sanction against plaintiff and giving defendant seven hours to conduct another 30(b)(6) deposition).

The same is true of Walles with regard to his utter lack of preparation on most of the topics for which he was designated, including topics 1, 2, 3, and 8, and his admittedly incomplete knowledge with regard to topic 12 (even as limited by Procura's attempted objections).

This lack of any attempt to prepare for the deposition by gathering information not within the immediate memory of the witnesses themselves was a clear abdication of Procura's responsibility under Fed. R. Civ. P. 30(b)(6).  Even if Walles and Junker could have been described as the individuals most knowledgeable within the organization on the topics for which they were designated (which, as to nearly every topic, they clearly were not), that is not the obligation Rule 30(b)(6) imposes.  *See, e.g.*, *Prokosch*, 193 F.R.D. at 638  ("By requiring the responding party to produce a witness who is capable of testifying as to matters known or reasonably available to the organization, the Rule makes plain its preference that a party not subvert the beneficial purposes of the Rule by simply incanting that no witness is available who personally has direct knowledge concerning all of the areas of inquiry." (internal quotation marks omitted)); *see also* 8A Wright & Miller, *supra*, § 2103 ("There is no obligation to select a person with personal knowledge of the events in question, but there is an obligation to proffer a person who can answer regarding information known or reasonably available to the organization." (internal quotation marks omitted)).  The obligation is to make a diligent effort to gather the information known to the organization as a whole, whether that information is in the form of documents or in the memories of the employees who were actually involved in the matters at issue.  *See, e.g.*, *Prokosch*, 193 F.R.D at 638–39 ("If need be, the responding

party must prepare deponents by having them review prior fact witness deposition testimony as well as documents and deposition exhibits." (internal quotation marks omitted)); *see also* 8A Wright & Miller, *supra*, § 2103.

Procura argues that such an interpretation puts an impossible expectation on the witnesses to memorize lists of facts, but that overstates the obligation that Rule 30(b)(6) imposes.  Even if Procura's objections and limitations had been procedurally effective, when Procura promised that Junker would be prepared to testify to the company's knowledge about topics 4, 5, and 6 to the extent they sought information about customers who had complained of "alleged functionality issues with the Procura Software similar to those alleged by Prairie River in this case," it undertook the obligation, at a minimum, to have Junker talk with those individuals within the organization who would know of any U.S. customers who had complaints about functionality, and to review documents that described those issues, so as to be able to identify all customers who had complained of similar issues (those issues having been categorized during discovery as "transition/implementation," "billing defects," "technical defects (synch and updates)," "clinical defects (Pathways and clinical day view)," and "Procura's capability in the U.S. Market"[21] and to talk knowledgeably about the issues and complaints they had identified. If he was concerned that he could not hold all of the necessary information in his memory, he (or someone under his direction) could have assembled documents and/or prepared a list with key information to aid his memory.  *Cf. Arctic Cat,* 210 F.R.D. at

---

[21] *See* footnote 9, *supra*.

685–86. It was not, however, an adequate response to parry Plaintiff's counsel's questions by insisting on being shown documents on which he would then deign to comment. *Id.* ("[I]t was facile for the deponent to state that he could only answer questions by reviewing records that he did not bring to the deposition site. If, as it appears, the deponent knew that he would need demonstrative aids, in Arctic Cat's possession, in order to meaningfully respond to reasonable expected questions, then the deponent should have brought those records to the deposition to assist him in answering those questions."). While, as Judge Erickson recognized, "the Rule 30(b)(6) deponent is not expected to be clairvoyant," *id.* at 686*,* it did not require clairvoyance to know that Prairie River expected the Procura witness to be prepared to identify and discuss all customers who had experienced issues with the software in the same general categories as those allegedly experienced by Prairie River, even if Procura's unilateral limitation of those topics had been valid (which it was not).

This is not a situation where Prairie River's counsel asked about a particular email with a particular customer and expected Junker to be able to discuss it from memory; Junker was unprepared with even the most basic identifying information because he, as Procura's representative, had not bothered to make the inquiry and do the preparation to answer reasonably foreseeable questions about this topic. His recurring response that he "would be happy to respond to anything that you could show me that you need me to answer" was both facile and inadequate. (Junker Dep. Tr. at 14:17–19; *see also id.* at 71:19–23, 73:25–74:2, 96:3–7; 152:21–22, 153:2–3, 158:21–24 (similar statements made by Junker); Walles Dep. Tr. at 18:5–8, 70:18–21, 104:1–4, 158:3–6, 177:1–3 (similar

44

statements made by Walles))  And that he might, had he made the inquiry, have disagreed with Prairie River's characterization of a particular complaint, its cause, or its similarity to Prairie River's situation, is beside the point when he did not bother to make a reasonable investigation into the *company's* knowledge of which customers had reported what problems and how those problems were or were not similar in nature or in origin to those reported by Prairie River.

Procura's outside counsel seems to think that the fact that he personally recorded five to seven hours—total—on deposition preparation of both witnesses for all topics, *see* (Sterling Decl. [Doc. No. 253 ¶3]), demonstrates the thoroughness of Procura's efforts. The Court is unimpressed, for several reasons.  First, the witnesses themselves remembered spending only one and one half hours (Junker) or two to three hours (Walles), give or take a short additional phone call, in preparation.  *See* (Junker Dep. Tr. at 69:17–71:6; Walles Dep. Tr. at 11:12–13:15.)  It is their preparation, not counsel's, that Rule 30(b)(6) is concerned about.  Second, as already noted, virtually none of that preparation involved gathering information from individuals within the organization who were likely to know something about the topics that the witnesses did not know.  Third, the proof is in the pudding.  The witnesses themselves both acknowledged and demonstrated their lack of preparation and their lack of readiness to discuss the full scope of the topics for which they had been designated, let alone the full scope of the topics originally identified.

As a result, the Court concludes that sanctions are warranted for Procura's failure to adequately prepare its 30(b)(6) witnesses as to topics 1, 2, 3, 4, 5, 6, 7, 8, 11, and 12.

45

The Court finds that Walles was adequately prepared to respond to questions about topic 13 and that he adequately answered questions about portions of topics 9 and 10. Before determining what sanctions are warranted, however, the Court must also address the other discovery-related matter raised by Prairie River's first motion for sanctions.

### B. Failure to Respond Fully to Discovery Seeking Information Related to Customer Complaints

As described in detail in the Background section above, the Court on more than one occasion ordered Procura to make a reasonably diligent search and to produce documents and information concerning customers who had complained of problems with the Procura software in the categories identified in the list provided by Prairie River's counsel. Prairie River has repeatedly raised concerns with the timeliness and completeness of Procura's supplemental responses, which have seemed to come only when Prairie River brings another dissatisfied customer to Procura's attention, thus bringing into question whether Procura's search methodology was indeed reasonable and diligent. Procura does not adequately explain why its supplemental responses have been chronically late and incomplete. It appears that Procura's methodology relied on search terms, *see* (Bermudez Decl. [Doc. No. 328 ¶ 9]), but while that might have been one part of a proper approach, the Court explicitly stated that reasonable diligence required searching in those locations likely to contain responsive information or documents and asking those individuals likely to know where responsive information or documents are located. (Nov. 28, 2018, Minute Entry at 2 n.1.) Furthermore, once it became clear that

this approach was not yielding substantially complete results, it should have become

equally clear that Procura needed to do more to comply with the Court's orders.

To be clear, the Court's orders were not limited to customers who experienced

problems that Procura in its judgment may have concluded were specifically caused by

the very same software design feature or line of code that caused the specific problems of

which Prairie River complains. The inquiry was broader than that, and was grounded in

the list of problem categories that Prairie River counsel provided to Procura counsel back

in June of 2018. The Court incorporated those categories by reference into its orders, and

it was incumbent upon Procura to proceed accordingly. Thus, customers who

experienced, e.g., *any* type of billing problems that they attributed to Procura's

software—whether or not Procura thought the software was to blame—would fall under

this umbrella. *Cf.* (Abbate-Dattilo Decl. Ex. F [Doc. No. 318-1 at 40].) Furthermore, if

Procura was intent on making fine distinctions in what the Court considers to be

relatively broad categories,[22] its responses made it impossible for Prairie River to

understand what those distinctions were so that it could determine whether to challenge

them. This is even more concerning given the Court's repeated admonitions to Procura

that it must "provide specific parameters of the discovery it is producing." (June 4, 2018,

IDR Conference Minute Entry at 2; *see also* Jan. 9, 2019, Order at 3.) Indeed, one of the

reasons the Court awarded attorneys' fees to Prairie River after the November 28, 2018,

---

[22] For example, Procura argues that "[a] concern about reports, even reports that are the
first step in a process of Medicare billing, does not equate or even relate to a billing
defect." *See* (Procura's Responsive Mem. in Opp'n to Prairie River's Mot. for Sanctions
[Doc. No. 326 at 3] (internal quotation marks omitted).)

hearing was that "Procura's responses and objections made it difficult if not impossible for Prairie River to determine whether and to what extent it had received complete responses," *see* (Jan. 9, 2019, Order at 3), and nothing before the Court suggests that Procura altered its approach at any point thereafter.

The record provides other good reason to doubt that Procura has made a reasonable search for and produced all responsive documents. For example, in the email attached as Exhibit L to a declaration of Pamela Abbate-Dattilo [Doc. No. 318], Chris Junker—Procura's CEO—asks why a particular client terminated its software licensing agreement. (Ex. L [Doc. No. 312 at 12].) There is no response to this email among the documents produced by Procura, although it seems highly unlikely that the CEO's email went unanswered.

But perhaps most important, Procura had the opportunity to answer key questions and, perhaps, to explain the apparent deficiencies in how it had gone about preserving, identifying, gathering, reviewing, and producing information about other disappointed software customers in response to Prairie River's Rule 30(b)(6) notice of deposition. But neither Junker, who was designated but unprepared to testify about topics relating to other customers, nor Walles, who was designated but unprepared to testify about how Procura gathered documents in response to Prairie River's requests, was in a position to answer those questions. Accordingly, the Court concludes on the basis of the record before it that Procura did not comply with the Court's prior discovery orders and did not make a reasonable search nor fully and timely supplement its interrogatory responses and document production as required.

**C.    Sanctions in Favor of Prairie River for Procura's Discovery Conduct**

In light of the foregoing, the Court finds that sanctions against Procura are warranted.  The more difficult, and consequential, question is what sanctions are appropriate under the circumstances.

Under Rule 37, a court may issue "just orders" for a party's failure to obey court-ordered discovery obligations. Fed. R. Civ. P. 37(b)(2)(A). This can include: (1) "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims"; (2) "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence"; (3) striking pleadings; (4) dismissing the action in whole or part; (5) rendering a default judgment; and (6) treating the action as contempt of court.  *Id.*  Further, Rule 37(d)(3) provides that sanctions for a failure to appear at a deposition may include any of the sanctions that could be imposed for a violation of a court order on discovery.  Rule 37(d)(3) also provides that instead of or in addition to those sanctions, "the court *must* require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." (Emphasis added).

The Court has discretion and inherent authority to fashion discovery sanctions. *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702 (8th Cir. 2018); *Sentis Grp., Inc. v. Shell Oil Co.*, 763 F.3d 919, 924 (8th Cir. 2014). That said, the "'district court's discretion to fashion a remedy or sanction for discovery violations under

Rule 37 is not absolute,' but 'narrows as the severity of the sanction or remedy it elects increases.'" *Vanderberg*, 906 F.3d at 704 (quoting *Doe v. Young*, 664 F.3d 727, 734 (8th Cir. 2011)).

Here, Prairie River seeks sanctions for Procura's failure to produce fully prepared witnesses in response to Prairie River's notice of Rule 30(b)(6) deposition, and for its failure to produce documents pursuant to this Court's discovery orders. The sanctions sought include not only monetary sanctions, but adverse findings of fact and evidentiary bars that go to the heart of the case. *See* (Prairie River's Mem. in Supp. of First Mot. for Sanctions at 40–41.) Specifically, Prairie River requests the following:

1. A jury instruction "that Procura failed to adequately collect, search for, identify, and/or retrieve documents responsive to Prairie River's Discovery Requests and Procura failed to adequately preserve documents for this litigation."

2. That the following facts

> be designated as established facts for purposes of this action and that Procura be prohibited from opposing these facts at trial or introducing any evidence to that end:
>> [a.] . . . No mid-sized or large home healthcare company has ever successfully used Procura's Software in the U.S.
>> [b.] . . . Procura has refused, despite a Court Order directing Procura to do so, to disclose all disputes it has had with customers in the U.S. regarding defects and deficiencies with the Procura Software.
>> [c.] . . . Procura has refused, despite a Court Order directing Procura to do so, to disclose all U.S. customers who have terminated or cancelled their license agreements with Procura due to defects and deficiencies with Procura's Software.

> [d.] . . . Procura has not sold the Software to a single U.S.
> home healthcare company since the sale of the Software to
> Prairie River.
> [e.] . . . Procura made misrepresentations to Prairie River
> regarding the Software prior to the sale.
> [f.] . . . Procura failed to address the concerns and complaints
> raised by Prairie River regarding the Software after the
> License Agreement was signed.

(*Id.*)  Furthermore, Prairie River requests that Procura be precluded "from opposing

Prairie River's evidence regarding the breakdown of Procura sales to U.S. customers as

compared to Australian and Canadian customers at trial or introducing evidence to that

end" and from "offering its own testimony or arguments regarding Procura's

interpretation of the terms of the License Agreement at trial or introducing any evidence

to that end."  (*Id.* at 41.)

In the context of this dispute, the adverse factual findings and evidentiary bars

sought by Prairie River are severe, and in some respects nearly outcome-determinative.

The Eighth Circuit has noted that "the opportunity to be heard is a litigant's most

precious right and should be sparingly denied." *Chrysler Corp. v. Carey*, 186 F.3d 1016,

1020 (8th Cir.1999) (internal quotation marks omitted).  Thus, courts have generally,

although not universally, held that severe sanctions such as adverse findings or

inferences, evidentiary bars, or striking of all or part of a party's pleading requires that

the court find not only a violation, but that the violation was willful.  *See, e.g.*, *Krueger v.*

*Ameriprise Fin., Inc.*, No. 11-cv-2781 (SRN/JSM), 2014 WL 8108458, at *6–7

(Mayeron, Mag. J.) (citing various cases that discuss the different standards for the

different discovery sanctions available to the court).  On the other hand, courts in this

District have recognized that in some circumstances "[t]he judicial admission of certain facts as established in response to a Rule 37(b)(2) motion is not necessarily a severe sanction." *Card Tech. Corp. v. DataCard Inc.*, 249 F.R.D. 567, 571 (D. Minn. 2008) (Davis, J.).  For instance, "[t]he presumption of certain facts does not offend the right to due process and can be narrowly tailored to provide the information not produced in discovery."  *Id.*  The Supreme Court has also noted that "[t]he preservation of due process [is] secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705 (1982) (internal quotations marks omitted).  Nevertheless, courts should impose such sanctions only after "consider[ing] whether a lesser sanction is available or appropriate."  *Keefer v. Provident Life & Accident Ins. Co.*, 238 F.3d 937, 941 (8th Cir. 2000).

Here, the Court has found that Procura failed to produce properly prepared witnesses for the noticed Rule 30(b)(6) deposition, and failed to timely and completely supplement its responses in compliance with this Court's orders.  Given all the circumstances as set forth at length above, the Court also finds that those failures on Procura's part were willful.  Furthermore, Procura's discovery delays and failures have consumed the time allotted for fact discovery (including extensions) in this case, and Prairie River understandably urges that simply allowing a "do-over" and more time for discovery would be prejudicial to Prairie River.

That said, the Court believes that the full array of adverse findings sought by Prairie River go too far and are not well-tailored to the situation at hand. Accordingly, having taken into account all of the circumstances and having considered the full range of potential sanctions, the Court believes that the most appropriate remedy is a combination of (1) certain evidentiary sanctions that it respectfully recommends to the District Judge, (2) giving Prairie River the opportunity to retake Procura's Rule 30(b)(6) deposition on certain specific topics; and (3) monetary sanctions, as follows:

### 1. Recommended Evidentiary Sanctions

#### a. Other Customers Who Have Complained about the Procura Software

Procura brought to the Rule 30(b)(6) deposition a corporate designee (Junker) who had made little or no investigation beyond his own limited personal knowledge into the following topics:

- All disputes, formal or informal, Procura has had with customers in the U.S. regarding its Software (Topic No. 4)

- All disputes, formal or informal, Procura has had with customers in the U.S. regarding its Software (Topic No. 5)

- The identities of and circumstances surrounding any customers in the U.S. who have terminated or cancelled their license agreement with Procura (Topic No. 6)

Moreover, the Court has found Procura has failed to comply with the Court's orders requiring that it supplement its written responses and document production in

response to Prairie River's written discovery requests that substantially overlapped these topics.  The Court further found that the failures were willful.  The Court therefore respectfully recommends that the District Court instruct the jury that Procura violated a Court order requiring it to disclose all disputes it has had with customers in the U.S. regarding complaints about the Procura software that were similar to Prairie River's complaints, and all U.S. customers who terminated their licenses with Procura because of similar complaints about the Procura software, and that it failed to produce a witness to testify about the company's knowledge of customer complaints regarding the Procura software.  The Court further respectfully recommends that the District Court instruct the jury that it may draw an adverse inference about the number and nature of customer complaints made to Procura about its software as a result of Procura's failure to provide this information.

> **b.    Representations Procura Made to Prairie River about the Software and Efforts Made by Procura to Address Prairie River's Complaints**

The same Procura witness (Junker) made little or no investigation beyond his own limited knowledge and unvalidated assumptions into the following topics:

- All representations made to Prairie River regarding the Software prior to the sale (Topic No. 7)

- All efforts made to address concerns and complaints raised by Prairie River regarding the Software after the License Agreement was signed (Topic No. 8)

Prairie River asks the Court to find as "established facts" that "Procura made misrepresentations to Prairie River regarding the Software prior to the sale" and that "Procura failed to address the concerns and complaints raised by Prairie River regarding the Software after the License Agreement was signed." The Court recommends against such findings for several reasons. As to the first of the proposed findings, it would go to the heart of one of the ultimate issues in the case. Moreover, the first proposed finding is not grounded in any particular misrepresentation, so it would leave the Court and the jury at sea when it comes to issues of causation and damages. The second proposed finding is similarly vague and untethered to specific issues of causation and damages.

However, the Court does respectfully recommend as an appropriate sanction that Procura be precluded from introducing any affirmative declarations or testimony from its own employees and officers or employees and officers of any Procura affiliate about what representations Procura did or did not make to Prairie River and what specific efforts it did or did not make to address Prairie River's complaints or concerns after the License Agreement was signed. The Court makes this recommendation on the ground that Procura forfeited the opportunity to come forward with such information when it failed to produce a witness who had been properly prepared on those subjects. To the extent other witnesses, including former Procura employees, have already been deposed in this case and have testified from personal knowledge on these topics, the Court's recommendation, if adopted by the District Judge, would not preclude Procura from citing to or eliciting that testimony from those witnesses.

### c.    Procura's Interpretation of the Terms of the License Agreement

Prairie River asserts that Procura's witness Walles was unprepared to answer questions about Procura's interpretation of the terms of the License Agreement (topic 10) and therefore asks the Court to preclude Procura from "offering its own testimony or arguments regarding Procura's interpretation of the terms of the License Agreement at trial or introducing any evidence to that end."  There were two parts to that topic addressed during Walles's deposition.  On the issue of interpretation of the warranty provisions, the Court finds that Walles was not unprepared.  Rather, in response to some questions, he demurred on the ground that the interpretation of the warranty provisions was a legal question and he had no additional insight to offer.  To a large extent, the Court agrees.  The Court saw nothing in the Walles deposition to justify precluding Procura from making legal arguments about how the terms of the contract should be interpreted.  That said, the Court is obviously not in a position to comment about whether, in the specific circumstances of this case, the District Judge may conclude that extrinsic evidence of the interpretation of those provisions is admissible.  To the extent Walles, as Procura's corporate designee, responded during the deposition that he had nothing to say about the interpretation of certain warranty provisions, then if Procura seeks to introduce a declaration or trial testimony on an interpretation to which Walles declined to testify, the Court anticipates an objection by Prairie River would be well-taken.  On the other hand, where Walles did answer a question on this topic, the Court sees no reason to preclude Procura from introducing such testimony from a

knowledgeable witness at trial (if the District Judge finds such testimony from either side to be relevant).  Similarly, if there was no inquiry during the deposition into a particular aspect of contract interpretation, Prairie River can hardly complain that Procura should not be permitted to offer testimony about it if that testimony is otherwise competent and relevant.

Walles's testimony relating to the definition and composition of the contract "documentation," on the other hand, presents a different problem.  That issue is very much fact-intensive and it varies from sale to sale, as Walles himself acknowledged. Walles was unprepared and unable to testify on behalf of Procura about what specific body of documents comprise the "documentation" under the contract.  Although he knew that some group of documents had been assembled and produced to Prairie River as the "documentation" during the litigation, he did not know what those documents were, how they had been assembled, or whether they were complete.  Therefore, the Court respectfully recommends that Procura be precluded from offering declarations or affirmative testimony at trial from its own employees and officers or employees and officers of any Procura affiliate about what specific documents comprise the "documentation" under the contract. To the extent other witnesses, including former Procura employees, have already been deposed in this case and have testified from personal knowledge on this topics, the Court's recommendation, if adopted by the District Judge, would not preclude Procura from citing to or eliciting that testimony from those witnesses.

### 2.    Opportunity to Retake Procura's Rule 30(b)(6) Deposition

Prairie River sought additional evidentiary sanctions regarding several matters relating to Procura's sales of the software in the U.S., on the ground that Procura's witnesses were not prepared with the information sought.  Specifically, Prairie River asks that the Court find as "established facts" (and preclude Procura from introducing any evidence to the contrary) that "no mid-sized or large home healthcare company has ever successfully used Procura's Software in the U.S., and that "Procura has not sold the Software to a single U.S. home healthcare company since the sale of the Software to Prairie River."  Prairie River also asks that the Court preclude Procura "from opposing Prairie River's evidence regarding the breakdown of Procura sales to U.S. customers as compared to Australian and Canadian customers at trial or introducing evidence to that end."

The deposition topics that ostensibly encompassed those purported items—"the history and status of Procura's Software sales in the U.S., including all versions of the Software that have been sold in the U.S. and identities of all past and present customers in the U.S. and the date of each sale" (topic 4),  "all sales Procura has made in the U.S. to home health care companies since selling the Software to Prairie River" (topic 9), "a comparison of Procura's Software sales in the U.S. to its sales in other countries" (topic 11), and "Procura's financial performance, including its revenues and annual monthly profit and loss statements, for 2012 through 2017 (topic 12)—were quite broad and in several respects ambiguous.  While Procura's objections to those topics were late and were not properly raised by filing a motion for protective order, the Court can still take

the objectionable nature of the topics into account in determining appropriate sanctions. *See, e.g., Arctic Cat, Inc.*, 210 F.R.D. at 686. Here, the Court finds that an evidentiary sanction would not be appropriate. Rather, the Court concludes that a more appropriate remedy would be to allow Prairie River, at its option, to retake the Rule 30(b)(6) deposition of Procura, at Procura's expense, solely on the following topics:

(1) All mid-sized and large home health care companies in the U.S. who have purchased a license for the Procura Software, which version they purchased, when they purchased it, whether they successfully implemented it, whether they still use it, and if not, why not;

(2) The identity of any home health care company in the U.S. that purchased a license for the Procura software after Prairie River signed the License Agreement; and

(3) A comparison, by gross revenue, profits, and numbers of customers, of Procura's software sales in the U.S. to its software sales in each of Australia and Canada.

The decision whether to retake the Rule 30(b)(6) deposition of Procura on one or all of these topics is entirely up to Prairie River. It may conclude it has adequate information on these topics already to meet its needs for dispositive motion practice and trial. If it chooses to proceed, however, Prairie River must **within 7 days** of the date of this Order e-file a letter stating whether it intends to take an additional Rule 30(b)(6) deposition of Procura consistent with the provisions of this Order and if so, on which of the specific topics set forth above. If Prairie River states its intent to take an additional

Rule 30(b)(6) deposition of Procura, that deposition shall occur in the offices of Prairie River's counsel in Minneapolis, Minnesota, and all costs incurred in connection with the deposition (including but not limited to the court reporter, videographer, and the travel expenses of the witness or witnesses) will be borne by Procura. For each such topic, Procura will produce a witness or witnesses who are fully prepared to testify as to the information known by or reasonably accessible to the company on that topic, whether that information is in documentary form or known to employees or officers of the company. The parties must meet in good faith to schedule the deposition as soon as practicable and in any event no later than August 19, 2019. Any conflict in scheduling will be resolved in favor of the schedule of Prairie River's counsel. Absent good cause shown, the total time on the record for such additional deposition (regardless of the number of topics selected or witnesses designated) shall be not more than four hours in total.

### 3.    Monetary Sanctions

Rule 37(d)(3) provides where a party has failed to appear for a deposition, "the court *must* require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." (Emphasis added.) Accordingly, in addition to the sanctions ordered and recommended above, the Court will order that Procura pay Prairie River's reasonable attorneys' fees and costs in connection with bringing its First Motion for Sanctions. Therefore, Prairie River is instructed to file within fourteen days of the date of this Order

60

a declaration, with supporting documentation, redacted for privilege and work product purposes to the extent necessary, as to its fees and costs incurred in connection with that motion.

## III. PRAIRIE RIVER'S AND SALO'S MOTIONS FOR SANCTIONS FOR PROCURA'S CANCELLATION OF THE PRIVATE MEDIATION

It is undisputed that the parties stipulated to entry of a scheduling order requiring that they would engage in private mediation on or before February 28, 2019. (Third Stipulation to Amend Scheduling Order [Doc. No. 182].) The Court memorialized the deadline in its December 6, 2018, Order. Under Rule 37(b), failure to abide by the Court's pretrial scheduling order is sanctionable and may be remedied through any "just order." *Cf. Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 236 (D. Minn. 2019) (Leung, Mag. J.). Here, Procura canceled the mediation without leave of the parties— and more importantly—without leave of the Court, and canceled it at a time when it would be impossible to reschedule before the ordered deadline. To the extent Procura was unable to attend the scheduled mediation, the proper course of action was to timely move to amend the pretrial schedule, not take matters into its own hands and submarine the mediation a few days before it was scheduled to occur. Adding insult to injury, Procura did not inform the parties that it had done so, opting to leave the other parties under the impression that the mediation was still scheduled while it pretended to seek their agreement to reschedule it. Thus—like most of the questions before the Court regarding Prairie River's and Salo's respective motions for sanctions—the issue is not whether sanctions are warranted, but what sanctions are appropriate.

61

In this regard, it is relevant that the parties did, at the Court's urging, attend a mediation on May 8, 2019, with the Honorable John W. Borg (ret.). The mediation did not result in settlement. Accordingly, the most appropriate measure of sanctions here is the incremental expense incurred by Prairie River and Salo as a result of the canceled mediation with Judge Boylan. The Court assumes that *some* work in preparation for the canceled mediation did not have to be repeated for the May mediation, but it is unrealistic to assume that the passage of time between the two mediations and the fact that the mediators were different did not require additional preparation. As it would be difficult to achieve complete precision in this regard, the Court believes a fair approach would be to award those fees and costs associated with (1) any client meetings and telephone conferences held to prepare for the cancelled mediation; (2) one-third of the fees associated with preparing any pre-mediation letter to Judge Boylan; and (3) the full fees associated with any other communications with Judge Boylan or his staff, written or oral, regarding the scheduling, conduct of, and cancelation of the mediation. In addition, if there were costs incurred by Prairie River and Salo's counsel and their respective client representatives for the February mediation, including air or hotel costs that could not be avoided after the final decision was made to cancel the mediation, and any cancellation fee or penalty charged by Judge Boylan, Prairie River and Salo are entitled to recoup those costs. Finally, the Court will award Prairie River and Salo their fees and costs associated with making their respective motions on this issue.

Therefore, Prairie River and Salo are instructed to file declarations with supporting documentation, redacted for privilege and work product purposes to the extent necessary,

as to the fees and costs incurred as described herein.  Those declarations and supporting documents must be filed within fourteen days of the date of this Order.

## IV.    PROCURA'S MOTION TO AMEND THE SCHEDULING ORDER

Procura seeks additional time for discovery in order to depose Salo witnesses.  *See* (Procura's Mem. in Supp. at 50; Procura's Suppl. Mem. in Supp. at 5.)  Specifically, Procura seeks to enlarge the scheduling order by thirty days to begin only after Salo certifies its discovery responses.  *See* (Procura's Mem. in Supp. at 50 (seeking a thirty-day extension to operative pretrial schedule); Procura's Suppl. Mem. in Supp. at 5 (asking that the extension be subject to Salo first certifying its discovery responses).)  For the reasons stated below, the Court declines to amend the operative pretrial schedule for that purpose.[23]

Federal Rule of Civil Procedure 16 provides that the court "must issue a scheduling order," which "must limit the time to join other parties, amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P. 16(b)(1), (3)(A). The scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).  In addition, Rule 16(d) states that the pretrial order "controls the course of the action unless the court modifies it."

---

[23] At first blush, it might appear that this motion is moot in light of Judge Tunheim's order dismissing Procura's third-party complaint against Salo.  The Court concludes that it is not.  If Procura could show good cause to extend the scheduling order to obtain additional discovery from Salo, it would have good cause whether or not Salo is a party, as it could pursue a corporate deposition of Salo by subpoena under Federal Rule of Civil Procedure 45.  Therefore, Salo's departure from the case does not, in and of itself, dispose of Procura's motion.

"The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir.2006), *superseded on other grounds by Rivera v. Illinois*, 556 U.S. 148 (2009); *see also* Fed. R. Civ. P. 16(b), advisory committee's note to 1983 amendment ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension.").  "[T]he 'good cause' standard [of Rule 16(b)] is an exacting one, for it demands a demonstration that the existing schedule cannot be reasonably be met despite the diligence of the party seeking the extension." *Archer Daniels Midland v. Aon Risk Servs., Inc.*, 187 F.R.D. 578, 581–82 (D. Minn. 1999) (Erickson, Mag. J.).

"While the prejudice to the nonmovant resulting from modification of the scheduling order may also be a relevant factor, generally, we will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines." *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 717 (8th Cir. 2008).  The court in *Sherman* went on to state "[o]ur cases reviewing Rule 16(b) rulings focus in the first instance (and usually solely) on the diligence of the party who sought modification of the order." *Id.* (citing cases).

The Court concludes that Procura's conduct falls well short of the diligence standard required by the Eighth Circuit.  First, Procura's record in meeting its own discovery obligations to the other parties is an unenviable one.  It has failed to provide timely supplementation as ordered and as promised, including producing discovery after the close of discovery and many months after the Court ordered that it be produced, it has

failed to timely provide to opposing counsel dates for noticed depositions or feedback on dates offered by opposing counsel, and it has failed to produce 30(b)(6) deponents that were adequately prepared, or failed to produce them at all.  The Court has little doubt that at least some of Procura's difficulty in scheduling depositions of Salo witnesses can be attributed to the disruptions caused by its failures to respond to the discovery requests of its opponents.

Further, Procura's problems that form the basis of its request for additional time to conduct its own discovery—namely the timing of discovery responses from Salo—are almost entirely of its own making.  The original Complaint in this case was filed on November 15, 2017.  There can be no question that Procura knew, or should have known, about Salo's role in the Prairie River project at that time.  Indeed, Procura was contemplating adding Salo to the case as early as February 2018, when Procura indicated to Prairie River its intention to do so.  *See, e.g.*, (Abbate-Dattilo Decl. No. 274 Ex. A [Doc. No. 274-1 at 2].)  And yet, Procura did not file its Third-Party Complaint against Salo until September 17, 2018.[24]  Then, Procura waited until January 14, 2019, to serve discovery requests on Salo, knowing full well that the deadline for substantial completion of document production to which the parties had stipulated was February 28, 2019, and the close of all fact discovery was March 31, 2019.

Procura's primary good-cause argument is that "Salo produced almost no documents from the onset of its involvement until late February 2019, after the date on

---

[24] In addition, at no point between February 2018 and September 17, 2018, did Procura attempt to obtain discovery from Salo under Rule 45.

which Salo proposed to take a Rule 30(b)(6) witness of Procura regarding issues implicated by Salo's documents, and after the date on which the parties had scheduled a mediation."[25] (Procura's Mem. in Supp. at 3.)  This argument fails for several reasons. First, Salo produced the project file identified in its Rule 26(a)(1) initial disclosures by December 30, 2018, as required by the scheduling order to which the parties had agreed. Second, and more important, Procura did not serve Rule 34(b) requests until January 14.[26]  Moreover, those requests *did not* "specify a reasonable time" for the inspection, as required by Rule 34(b)(1)(B).  Salo reasonably sought and received from Procura an extension of time until March 6 to respond to the requests, yet it began producing documents in mid-February and substantially completed its production by February 28. Put simply, diligent counsel would probably have brought Salo into the case earlier, and certainly, once Salo was in the case, would have promptly served discovery on Salo so that the stipulated deadlines could be met.  Procura has only itself to blame that it did not.

Furthermore, Procura's argument that Salo's responses were inadequate does not salvage its request for additional time for discovery.  It received the documents by the end of February, and the written responses, as promised, by March 6, yet it filed a motion to compel on March 22 without having complied with the local rules and this Court's

---

[25] The Court notes that Procura did not serve its own initial disclosures on Salo until February 1, 2019.  *See* (Thompson Decl. No. 243 Ex. 81 at 55–58.)

[26] While Salo and Procura discussed ESI search methodology in December (another endeavor on which Procura did not distinguish itself by its responsiveness), search terms are not requests for production under Rule 34(b).  In short, there was no basis for Procura to expect Salo to produce documents in addition to its initial disclosures except as prescribed by Rule 34.

orders and reminders that it meet and confer with Salo counsel before filing such a motion. *See, e.g.,* (Feb. 28, 2019 Minute Entry [Doc. No. 219 at 2].) When the parties did meet and confer, which appears not to have happened until April 8, they were able to resolve the disputes, Salo committed to supplementing its production by April 12, and Procura withdrew its motion. *See* (Apr. 5, 2019, Minute Entry [Doc. No. 299 at 2]; Apr. 10, 2019, Letter [Doc. No. 304]; Apr. 12, 2019, Text Only Order [Doc. No. 314].)

The Court does not doubt Procura's assessment that it could not move forward with depositions of Salo's witnesses until it received Salo's documents. *See, e.g.*, (Procura's Suppl. Mem. in Supp. of Mot. to Amend at 3.) But the interrelationship between document production and depositions is not a new concept. Diligent counsel are required to think ahead about what they will need in order to do what they need to do, and then to take the necessary steps to get it done in time, insofar as it is within their control. Procura simply was not diligent, but instead of attempting to offer an explanation for that lack of diligence, Procura has sought to blame everyone else. That effort is misdirected.

Accordingly, the Court finds that Procura has failed to show that it was diligent in its efforts to comply with the scheduling order. Furthermore, although that alone would be sufficient to deny its request to extend the time for it to conduct discovery, *Sherman*, 532 F.3d at 717, the Court also finds that Prairie River would be prejudiced if the Court were to grant the extension sought by Procura. Therefore, the Court denies Procura's motion to amend the scheduling order for the purpose of allowing it to conduct additional discovery.

## V.    CONCLUSION

Accordingly, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Prairie River Home Care, Inc.'s First Motion for Sanctions [Doc. No. 225] against Procura, LLC is **GRANTED in part** as follows:

   a.    The Court recommends to the District Judge that certain evidentiary sanctions be imposed on Procura in connection with dispositive motion practice and trial, as more fully set forth below;

   b.    Prairie River may at its option take an additional Rule 30(b)(6) deposition of Procura on the topics and within the limitations set forth in this Order.  If Prairie River wishes to take that deposition, it must **within 7 days** of the date of this Order e-file a letter stating its intention to do so, and on what specific topics (within those permitted by this Order).  Any such deposition will take place in the offices of Prairie River's counsel in Minneapolis, Minnesota, and all costs incurred in connection with the deposition (including but not limited to the court reporter, videographer, and the travel expenses of the witness or witnesses) will be borne by Procura.  For each such topic, Procura must produce a witness or witnesses who are fully prepared to testify as to the information known by or reasonably accessible to the company on that topic, whether that information is in documentary form or known to employees or officers of the

company.  The parties must meet in good faith to schedule the

deposition as soon as practicable and in any event no later than

August 15, 2019.  Any conflict in scheduling will be resolved in

favor of the schedule of Prairie River's counsel.  Absent good cause

shown, the total time on the record for the deposition (regardless of

the number of witnesses designated) shall not exceed five hours;

c.    Procura must pay Prairie River's reasonable costs and attorneys' fees

incurred in connection with the preparation, briefing, and argument

of Prairie River's First Motion for Sanctions.   Prairie River shall

**within 14 days** of the date of this Order file a declaration with

supporting documentation, redacted for privilege and work product

purposes to the extent necessary, as to the fees and costs incurred;

d.    In all other respects Prairie River's First Motion for Sanctions is

denied.

2.    Prairie River's Second Motion for Sanctions [Doc. No. 271], pertaining to

Procura's cancelation of the scheduled private mediation is **GRANTED** as

more fully set forth herein.   **Within 14 days** of the date of this Order,

Prairie River must file a declaration with supporting documents, redacted

only as necessary to protect attorney work product or privileged

communications, itemizing its attorneys' fees and costs associated with (1)

any client meetings and telephone conferences held to prepare for the

cancelled mediation; (2) preparing any pre-mediation letter to Judge

69

Boylan; (3) any other communications with Judge Boylan or his staff, written or oral, regarding the scheduling, conduct of, and cancelation of the mediation; (4) any costs incurred by Prairie River's counsel and/or client representatives for the February mediation, including air or hotel costs, that could not be avoided or reimbursed after the final decision was made to cancel the mediation; (5) any unreimbursed fee or penalty paid or owing by Prairie River to Judge Boylan; and (6) the attorneys' fees and costs incurred by Prairie River in connection with its second motion for sanctions;

3. Third-Party Defendant Salo Solutions, Inc.'s Motion for Sanctions [Doc. No. 240] against Procura is **DENIED in part** as moot to the extent it seeks sanctions in connection with Procura's failure to appear for Rule 30(b)(6) depositions, but is **GRANTED in part** with regard to Procura's cancelation of the private mediation, as described herein.  **Within 14 days** of the date of this Order, Salo must file a declaration with supporting documents, redacted only as necessary to protect attorney work product or privileged communications, itemizing its fees and costs associated with (1) any client meetings and telephone conferences held to prepare for the cancelled mediation; (2) preparing any pre-mediation letter to Judge Boylan; (3) any other communications with Judge Boylan or his staff, written or oral, regarding the scheduling, conduct of, and cancelation of the mediation; (4) any costs incurred by Salo's counsel and/or client representatives for the February mediation, including air or hotel costs, that could not be avoided

70

or reimbursed after the final decision was made to cancel the mediation; (5)
any unreimbursed fee or penalty paid or owing by Salo to Judge Boylan;
and (6) the attorneys' fees and costs incurred by Salo in connection with its
second motion for sanctions; and

4.  Procura's motion to amend the scheduling order [Doc. No 279] is

   **DENIED.**

In addition, **IT IS HEREBY RESPECTFULLY RECOMMENDED** that
evidentiary sanctions be imposed on Procura for its discovery conduct as follows:

1.  The jury be instructed, in such language as the District Court may
    determine to be appropriate and relevant to the proceedings, that:

    a.  Procura violated a Court order requiring it to disclose all disputes it
        has had with customers in the U.S. regarding complaints about the
        Procura software that were similar to Prairie River's complaints, and
        all customers in the U.S. who terminated their licenses with Procura
        because of similar complaints about the Procura software;

    b.  Procura failed to produce a witness to testify about the conpany's
        knowledge of customer complaints regarding the Procura software;
        and

    c.  The jury may draw an adverse inference from the fact that Procura
        failed to provide this information, about the number and nature of
        customer complaints made to Procura about its software.

2.      Procura be precluded from introducing any affirmative declarations or testimony from its own employees and officers or employees and officers of any Procura affiliate about what representations Procura did or did not make to Prairie River and what specific efforts it did or did not make to address Prairie River's complaints or concerns after the License Agreement was signed; and

3.      Procura be precluded from offering declarations or affirmative testimony at trial from its own employees and officers or employees and officers of any Procura affiliate about what specific documents comprise the "documentation" under the contract.

The parties shall show cause on or before seven (14) days from the date of this Order and Report and Recommendation why the Court should not unseal the Order and Report and Recommendation and specify any portion of the Order and Report and Recommendation that warrants redaction.

Dated: July 29, 2019

s/Hildy Bowbeer
HILDY BOWBEER
United States Magistrate Judge

## NOTICE

**Filing Objections:** To the extent this document contains recommendations to the District Judge, it is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to a magistrate judge's findings and recommendations within fourteen days after being served with a copy of the Report and Recommendation. A party may respond to the objections within fourteen days after being served with a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c)(1).